1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSEPH TERRELL JOHNSON,                    No.  2:12-cv-2887 MCE DAD P

12              Petitioner,

13         v.

14   SOTO, Warden,                              FINDINGS AND RECOMMENDATIONS

15              Respondent.

16

17         Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on December 1, 2006 in the Sacramento County Superior Court on charges of

20   murder occurring during the commission of an attempted robbery, five counts of robbery, and two

21   counts of attempted robbery, with the jury also finding that petitioner personally used a firearm

22   during the commission of his crimes.  Petitioner seeks federal habeas relief on the following

23   grounds:  (1) the trial court's denial of his motions to suppress pre-trial identifications and in-

24   court identifications denied him his right to due process; (2) the trial court's exclusion of third-

25   party culpability evidence violated his rights to a fair trial, to present a complete defense, and to

26   due process; (3) the trial court's refusal to allow the defense to elicit from a prosecution witness

27   petitioner's explanation for admissions made to his girlfriend violated his rights to a fair trial,

28   cross-examination of the witnesses against him, and due process; and (4) the cumulative effect of

1

the trial court's evidentiary errors violated his federal constitutional rights.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

**I. Background**

In a published opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> During a two-week period in 2005, defendants Joseph Johnson and Jessica Nicole Holmes, along with Holmes's boyfriend, Corey Schroeder, robbed or attempted to rob at least five gas stations in the Sacramento area.  Their mode of operation was virtually the same for each robbery:  Schroeder would case the station, Johnson would rob the station attendant at gunpoint, and Holmes would drive them away.  On the trio's last attempted robbery, Johnson shot and killed the station attendant, Prem Chetty.
>
> Separate juries convicted Johnson and Holmes of murder during the commission of an attempted robbery, and multiple counts of second degree robbery and attempted second degree robbery.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 211, 664.)  They also found true gun-use enhancements and principal-armed enhancements as to each count.  (Pen. Code, §§ 12022, subd. (a)(1), 12022.53, subds. (b), (d).) FN1
>
> FN1. The information also charged Schroeder, but his trial was severed from defendants' trial.
>
> The trial court sentenced Johnson to a prison term of life without the possibility of parole for the special circumstance murder, an additional 25 years to life for the firearm enhancement attached to the murder conviction, and an additional consecutive determinate term of 34 years four months for the remaining convictions and enhancements.
>
> The trial court sentenced Holmes also to a prison term of life without the possibility of parole for the special circumstance murder, an additional 25 years to life for the firearm enhancements attached to the murder conviction, and an additional consecutive term of seven years eight months for the remaining convictions and enhancements.
>
> * * *

/////

/////

/////

2

## FACTS

**June 25, 2005 Robbery at L & S Shell Gas Station, Madison Avenue and Auburn Boulevard (Count Three—Johnson only)**

At about 11:20 a.m. on June 25, 2005, Johnson entered the automotive repair store adjacent to the L & S Shell gas station. Timothy Meton was working as the cashier.  After the other customers left, Johnson pulled a gun from his waistband and demanded Meton give him "all the money."

As Meton took the money out of the cash register, Johnson "gestured" with the gun and told him to "[h]urry up."  Meton gave Johnson all of the cash in the tray.  Johnson told Meton to give him the money underneath the tray.  Meton showed Johnson there was no money underneath the tray.  Johnson stuffed the money into the front pocket of his sweatshirt and ran out the door toward a McDonald's restaurant located across the street.  Meton estimated he gave Johnson about $700.

Meton participated in two lineups.  The first, on July 10, 2005, was a photographic lineup that included Johnson.  Meton did not identify anyone.  The second, on July 15, 2005, was a live lineup. Meton requested the individuals each say "hurry up" and "underneath too."  He identified Johnson after hearing the individuals speak.  Johnson was the only person who was in both the photographic lineup and the live lineup.

Meton also identified Johnson in court as the robber.

Holmes's jury heard Holmes's July 11, 2005 interview with Sacramento County Sheriff's detectives.  Regarding this robbery, Holmes stated Johnson had called her and asked her to pick him up. She, Schroeder, and another girl did so.  Johnson directed Holmes to park at the McDonald's, and he went across the street to the Shell station.  After he came back from the Shell station, he said, "Let's leave."  After they drove out of the parking lot, Johnson told Holmes he had robbed the station.  Holmes knew Johnson had a gun with him.  She drove Johnson to another location, and he gave her $20 for the ride.

**June 28, 2005 Robbery at Arco Gas Station, Walerga Road and Hillsdale Boulevard (Count Four—Johnson and Holmes)**

On June 28, 2005, Kuljit Rai was working alone at his Arco gas station on the corner of Walerga Road and Hillsdale Boulevard in Sacramento County.  At about 2:00 p.m., Johnson entered the store and robbed Rai at gunpoint of about $75.  After Johnson ran out, Rai followed him and saw Johnson get into the back passenger seat of a small, white, four-door car.  Rai could not see anyone else in the car.

The store's surveillance tape showed a White male in a white tank top enter the store.  The tape also shows Johnson entering the store.

3

On July 15, 2009, Rai identified Johnson at a live lineup as the robber. Rai also identified Johnson in court as the robber.

During closing arguments, Johnson conceded his guilt to this crime.

**June 28, 2005 Attempted Robbery of Shell Gas Station, Auburn Boulevard and Antelope Road (Count Five—Johnson and Holmes)**

About 30 minutes after the Arco robbery, Johnson attempted to rob a Shell gas station at the corner of Auburn Boulevard and Antelope Road in Citrus Heights. Ewa Her was working at that station when, at about 2:30 p.m., he heard a voice behind him coming from the cash register counter. He turned around and saw Johnson standing at the counter and pointing a gun at him. Johnson repeatedly demanded Her to give him the money. When Her did not, Johnson put his hand on top of the gun and pulled back the slide. Her "freaked out" and ran to the back room. He never gave Johnson any money.

About a minute before Johnson came into the store, a White man in a white tank top came into the store and purchased a soda and some chips. Her did not attend a live lineup and he did not identify Johnson at trial.

There were two minors in the store at the time of the robbery. One of the minors saw Johnson put a glove on his right hand and possibly his left, pull a gun out, and heard him tell the clerk to give him money. The minors both identified Johnson at a live lineup and at trial as the robber.

Holmes's jury heard Holmes's statement that she had driven Johnson to this gas station, and she drove away after Johnson came back from the store.

During closing argument, Johnson conceded his guilt to this count.

**June 30, 2005 Robbery of Arco/Valero Gas Station at San Juan Avenue and Winding Way (Count Nine—Evidence Presented to Holmes's Jury Only)**

Thomas Claussen was working alone the evening of June 30, 2005, at the Arco/Valero gas station at San Juan Avenue and Winding Way.FN2 A tall, Black male entered the store. The man was slim, about 18 years old, wearing a blue Kobe Bryant jersey, a black baseball hat, and a glove on his hand. The man aimed his gun at Claussen and demanded money. Claussen gave the man all of the money in the cash drawer, about $130. After the robber left, Claussen went outside, but he could not see the man. Claussen saw a maroon pickup truck leave the area, but he did not know if the truck was related to the robbery.

FN2. The Attorney General refers to the station both as an Arco station and as a Valero station. Claussen testified he worked for

Valero but the station was branded as an Arco station.  To avoid confusion, we will refer to it as an Arco/Valero station.

Claussen attended a live lineup that included Johnson.  However, Claussen was unable to identify anyone as the robber of his store.  On the sheriff's department lineup identification form, Claussen wrote that the robber was darker skinned than any of the lineup participants.

Holmes told detectives she drove Johnson to the Arco/Valero station.  Johnson told her where to park.  Johnson went into a nearby liquor store and then went into the Arco/Valero station.  Johnson said nothing about a robbery when he came back to the car.  Holmes did not know Johnson had robbed the station until a couple of days later.

Deputies later seized a Kobe Bryant jersey from the home where Johnson had been living.  Johnson appears to be wearing the same jersey in a DMV photo.

As to Holmes, the court declared a mistrial on this count after her jury announced it was deadlocked.  The prosecutor subsequently moved to dismiss the charge, and the court granted the motion.

**June 30, 2005 Robbery of Chevron Gas Station at Dewey Drive and Madison Avenue (Count Six—Johnson and Holmes)**

Also on June 30, 2005, at about 8:20 p.m., Johnson entered a Chevron gas station on the corner of Dewey Drive and Madison Avenue, walked to the counter, pointed a gun at the employee, Jesus Fernandez, and demanded all the money.  Fernandez put all of the money from the cash register, between $250 and $300, into a bag and gave it to Johnson.  Johnson left the store and went behind a building.

On July 21, 2005, Detective Biondi showed Fernandez surveillance images from the robbery, and then showed him a photographic lineup.  Fernandez identified himself and the robber in the surveillance images.  Then, when viewing the photographs, Fernandez first pointed to Johnson and another person, but then he identified Johnson as the robber.  Fernandez did not attend a live lineup.  He identified Johnson in court as the robber.

As to Holmes, the court declared a mistrial on this count after her jury announced it was deadlocked.  The court later granted the prosecution's motion to dismiss the charge against Holmes.

**July 5, 2005 Uncharged Robbery in Roseville**

Shortly before 7:00 p.m., July 5, 2005, Johnson walked into a Valero gas station at Sunrise Avenue and Coloma Road in Roseville.  He picked up a soda, walked to the counter, pointed a gun at the employee, Rui Mar, and demanded she give him money from the cash register.  Mar told Johnson she could not open the register unless he purchased something.  Johnson continued

pointing the gun at Mar and threatening her.  She tried to hide behind an ice machine next to the register.  Johnson fired two shots and left.

Officers found two bullet holes behind the counter area.  One .380–caliber bullet was found inside cigarette packs stored behind the register.  Two .380–caliber shell casings were also found. Surveillance video taken from the store showed a man in a white tank top inside the store before the robber entered the store.

On July 8, 2005, at the request of a Roseville police sergeant, Mar viewed a media release and still photos posted on the Sacramento County Sheriff's Department Web site regarding a July 7 murder in Citrus Heights.  Mar informed the officer the person in the still photos was the same person who had attempted to rob her.

On July 15, 2005, Mar attended a live lineup in Sacramento County.  She quickly identified Johnson from the lineup as the robber.  Later, Mar identified Johnson in court as the robber.

Holmes's jury heard Holmes's statement to detectives that she drove Johnson to the Valero station in Roseville.  Schroeder went into the store to buy Holmes a soda.  Then Johnson went inside and came back with a soda.  Holmes had the radio on and did not hear any gunshots.   Johnson and Schroeder talked about Johnson shooting at the clerk.  Johnson said he had "shot right next to her."

Holmes denied she had known Johnson was going to commit a robbery.  She claimed she drove and parked wherever Johnson told her because "he needed [her] to take him."  She thought she was taking Johnson to buy marijuana.

**July 5, 2005 Robbery of Chevron Gas Station at Walnut Avenue and Marconi Avenue (Counts Seven and Eight— Johnson and Holmes)**

About 30 minutes after the uncharged Roseville robbery, Johnson walked into a Chevron gas station store at Walnut Avenue and Marconi Avenue in Sacramento County.  He picked up a container of milk and a bag of chips, walked to the counter, and asked the employee, Mathew Johnson, for a cigar.  Mathew turned around to get the cigar, and when he turned back around, Johnson was pointing a gun at him.  Johnson threatened to shoot unless Mathew gave him the money from the register.  As Mathew pulled the tray out of the register, another station employee, Lidia Fretwell, entered the store from the outside.  Mathew told Fretwell they were being robbed.  He tried to give Johnson the tray, but Johnson refused to touch it.  He ordered Mathew to remove the money and give it to him.  Mathew gave him about $170.  Johnson took the money and left.

Mathew followed Johnson outside and saw Johnson get into a white compact car, possibly a Ford Escort, behind the station.  He could not see if anyone else was in the car.  At trial, Mathew testified that Corey Schroeder, a man he knew from his apartment complex, had

come into the store about one hour before the robbery and had bought a pack of cigarettes.

A customer, Corrine Kelly, entered the store as a Black man exited the store holding a Nestle Quik.  Kelly saw the man walk to an

adjacent parking lot and get into a white or beige Ford Escort occupied with two other people.

Mathew identified Schroeder and Johnson in separate live lineups; Schroeder as the man who came into the store an hour before the robbery, and Johnson as the robber.   Mathew also identified Johnson as the robber at trial.

Fretwell identified Johnson as the robber from a photographic lineup.  She also identified Johnson at trial as the robber after she looked at the photo she had previously identified.  She did not attend a live lineup.

Holmes's jury heard Holmes's statement to detectives that she had driven Johnson to the Chevron station.  He told her to park behind the gas station.  Schroeder went into the store first to buy fireworks, she thought.  When Schroeder came back, Johnson asked him how many people were working inside the store.  Johnson told Holmes he had to get something and got out of the car.  Holmes drove away after Johnson came back.  Later, Johnson told her he had robbed the store.

**July 5, 2005 Purchase of Bullets at Big 5**

At about 8:00 p.m. on July 5, 2005, the evening of the Chevron gas station robbery and the uncharged Roseville robbery, Johnson, Holmes, Schroeder, and an unidentified Black male purchased ammunition at a Big 5 Sporting Goods store on Arden Way near Watt Avenue.  They bought a box of Remington .380 bullets with cash.  Video from the store's surveillance system shows the four people all standing by the ammunition counter at one point. Schroeder is wearing a white tank top.

Holmes's jury also heard Holmes's statement to detectives that she had driven Johnson to Big 5 to buy bullets.  She denied knowing what Johnson intended to do with them.  Holmes's sister's ex-boyfriend went with them to buy the bullets.

**July 7, 2005 Murder and Attempted Robbery at Shell Gas Station at Greenback Lane and Auburn Boulevard (Counts One and Two—Johnson and Holmes)**

On July 7, 2005, Prem Chetty was working at a Shell station at Greenback Lane and Auburn Boulevard in Citrus Heights.  He was killed that evening in an attempted robbery.

Surveillance videotape from the station recorded a Black man wearing a gray sweatshirt and a black cap take something out of one of the store's coolers.  He walked up to the store's counter

where Chetty was waiting.  The man picked up another item to buy, and then handed Chetty some money.  When Chetty opened the cash register drawer, the man pulled a gun on Chetty and demanded the money.  When Chetty did not give the robber any money, the man shot Chetty more than once and then left the store.  Chetty died of gunshot wounds to the neck and chest.

The video also appears to portray Schroeder wearing a red shirt inside the store prior to the robbery.

Three witnesses who were in the vicinity of the Shell station at the time of the murder testified.  Kimberly Irvine was at the Chevron station across the street when she heard a couple of gunshots.  She looked toward the Shell station and saw a man wearing dark clothing run out of the store and toward the fence and bushes that divided the Shell station from a Jack–in–the–Box restaurant.  The man ran out of view and she did not see where he went.

Dee Scott–Chee and Carol Webber were in a car stopped at the traffic light at Greenback Lane and Auburn Boulevard when Chee heard two gunshots.  She saw a person run quickly from the Shell station into the bushes dividing the station and the Jack–in–the–Box.

Webber stated she saw the face of the man leaving the station.  At a photo lineup, Webber selected the photograph of Johnson's cousin, Thaddeus Taylor, as the person who looked "the closest in the eyes."  Later, at a subsequent photo lineup, Webber again did not select Johnson as the man she saw.

Randy Cockrell was sitting inside his car with his girlfriend at the Gold's Gym parking lot near Greenback Lane and Auburn Boulevard when he heard two gunshots.  He looked in his rearview mirror and saw a White male run from the Shell station toward a white, four-door sedan that was parked behind the Jack–in–the–Box.  The sedan drove onto Greenback Lane toward the freeway.

Deputies recovered three spent shell casings and two deformed copper-jacketed bullets from the scene.  The casings were each marked with a head stamp of "R–P .380 auto."

Holmes's jury heard her statement to detectives in which she admitted driving Johnson to the Shell station.  She drove a white, 1994 Ford Escort, which was registered in her mother's name.  She had picked Johnson up at the home of his cousin, Thaddeus Taylor, with whom he had been living.  Johnson told Holmes he wanted to "get something," so Holmes stopped at the Shell station.  Johnson told her to park by the fence between the station and the Jack–in–the–Box.  Johnson got out of the car with Schroeder.  Schroeder went inside the store to buy cigarettes.  He returned to the car and told Johnson and Holmes he could not buy them because the store clerk had asked him for identification.

Holmes stated Johnson either went through a hole in the fence or jumped the fence to get to the station.  Holmes heard three

gunshots.  Johnson came back to the car and got in the backseat. After they drove away, Johnson told Holmes and Schroeder that he had "tried to rob" the clerk and had shot him.  Neither Holmes nor Schroeder believed him.  Holmes told the detectives she did not know about the murder until the day of her interview.

Johnson had two girlfriends, Chelsea Ciscoe and Natalie Brand, with whom he spent time after the murder and prior to his arrest. He admitted the murder to both women.  Chelsea told detectives that Johnson told her the clerk at the Shell station had reached for Johnson's gun and Johnson "freaked out."  Johnson said the clerk was going for the gun and Johnson thought he might be shot. Johnson told Chelsea he "blinked" and the whole incident was over.

Natalie told detectives that Johnson had admitted he killed the clerk.  Johnson told Natalie that he went to rob the clerk, but he did not mean to shoot and kill him.  The clerk had grabbed for the gun, Johnson had been scared, and he fired the gun.   Johnson told Natalie that he had gone to do the robbery because his uncle with whom he had been living had kicked him out of the house.  Natalie recanted her statements at trial.

Detectives searched the bedroom Johnson shared with his cousin, Thaddeus Taylor.  Thaddeus directed detectives to a speaker box. Inside, detectives found a Beretta model 84, nine millimeter handgun.FN3  There was a live round inside the chamber and nine live rounds in the magazine.   Detectives also found a box of Remington .380–caliber ammunition from Big 5.  Inside the box were 44 .380–caliber round-nose bullets and three .380–caliber hollow-point bullets.  The box had empty spaces for three bullets.

FN3. The detective who retrieved the handgun testified that the gun fired both .380 caliber and nine millimeter rounds.

At the sheriff's station, Thaddeus's father, Fred Taylor, viewed still photographs from the Shell station surveillance videotape and also the surveillance video.  He identified Johnson as the person depicted in the surveillance photos.

Thaddeus told detectives the person depicted in the still photos resembled Johnson, and Johnson had a hat and sweatshirt like the person in the video wore.  Thaddeus began to cry when he saw the surveillance video.  He told the detectives the person in the video looked like Johnson, and he was pretty sure it was Johnson.

Thaddeus testified that Johnson first showed him a gun after Johnson returned from a trip to Los Angeles.  Thaddeus saw the gun maybe one or two more times.   The gun was kept in the bedroom in a speaker box connected to the computer.  Thaddeus had never fired the gun.

Immediately prior to his arrest, Johnson called his Uncle Fred.  Fred encouraged Johnson to turn himself in.  Johnson told Fred that he had "shot someone Thursday night."   Johnson then surrendered himself to authorities.

1   Johnson gave a statement to detectives in which he admitted
2   shooting Chetty, shooting at Rui Mar in the uncharged Roseville
    robbery, and committing the other robberies, including the robbery
3   at the Valero/Arco station against Thomas Claussen. The trial court
    suppressed Johnson's confession on <u>Miranda</u> grounds.

4   A forensic specialist determined the two .380 caliber casings and
    one .380 caliber bullet recovered from the uncharged Roseville
5   robbery scene, and the .380 caliber casings and two .380 caliber
    bullets recovered from the Shell station murder scene, were all
6   discharged from the Beretta nine millimeter handgun found in
    Thaddeus's and Johnson's bedroom.
7
    We provide additional facts below as needed.
8

9   <u>People v. Johnson</u>, 183 Cal.App.4th 253, 261-270 (2010).

10       On April 26, 2010, through appointed counsel, petitioner filed a petition for review in the

11   California Supreme Court. On July 14, 2010, the California Supreme Court denied review. On

12   June 29, 2011, petitioner filed a pro se petition for a writ of habeas corpus in the Sacramento

13   County Superior Court, which was denied on August 23, 2011. On September 28, 2011,

14   petitioner filed a pro se petition for a writ of habeas corpus in the California Court of Appeal.

15   That petition was summarily denied on October 6, 2011. Finally, on June 21, 2012, petitioner

16   filed a pro se petition for writ of habeas corpus in the California Supreme Court. That petition

17   was denied on October 10, 2012, with the California Supreme Court citing the decisions in <u>People</u>

18   <u>v. Duvall</u>, 9 Cal.4th 464 (1995) and <u>Ex parte Swain</u>, 34 Cal.2d 300 (1949). (Resp't's Lodged

19   Docs., lodged April 11, 2013, Nos. 5-14.)

20       Petitioner filed his federal habeas petition with this court on or about November 28, 2012.

21   On December 10, 2012, the court directed respondent to file a response to the petition. Before

22   respondent filed a response in this case, petitioner filed a motion for appointment of counsel. On

23   January 14, 2013, the court appointed the Office of the Federal Defender for the Eastern District

24   of California to represent petitioner. By order dated January 30, 2013, petitioner's current habeas

25   counsel substituted in as appointed counsel of record for petitioner in place of the Office of the

26   Federal Defender.

27       On January 26, 2014, after respondent's motion to dismiss the pending petition as time-

28   barred was denied, petitioner filed the amended petition for a writ of habeas corpus upon which

1  this action now proceeds.  Respondent filed an answer on September 8, 2014, and petitioner filed

2  a traverse on November 5, 2014.

3  **II.  Standards of Review Applicable to Habeas Corpus Claims**

4          An application for a writ of habeas corpus by a person in custody under a judgment of a

5  state court can be granted only for violations of the Constitution or laws of the United States.  28

6  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

7  application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

8  U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

9          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

10  corpus relief:

11              An application for a writ of habeas corpus on behalf of a
    person in custody pursuant to the judgment of a State court shall not
12  be granted with respect to any claim that was adjudicated on the
    merits in State court proceedings unless the adjudication of the
13  claim -

14              (1) resulted in a decision that was contrary to, or involved
    an unreasonable application of, clearly established Federal law, as
15  determined by the Supreme Court of the United States; or

16              (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
17  State court proceeding.

18          For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

19  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

20  Greene v. Fisher, ___ U.S. ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859

21  (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent

22  "may be persuasive in determining what law is clearly established and whether a state court

23  applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561,

24  567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general

25  principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

26  not announced."  Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013) (citing

27  Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to

28  "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

1    it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts

2    of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

3    established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

4         A state court decision is "contrary to" clearly established federal law if it applies a rule

5    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

6    precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

7    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

8    writ if the state court identifies the correct governing legal principle from the Supreme Court's

9    decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1]  Lockyer v.

10   Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

11   (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court

12   concludes in its independent judgment that the relevant state-court decision applied clearly

13   established federal law erroneously or incorrectly.  Rather, that application must also be

14   unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

15   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

16   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

17   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

18   'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

19   Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

20   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

21   must show that the state court's ruling on the claim being presented in federal court was so

22   lacking in justification that there was an error well understood and comprehended in existing law

23   beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

24        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

25   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

26   _____

27   [1]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

2   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

3   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

4   de novo the constitutional issues raised.").

5          The court looks to the last reasoned state court decision as the basis for the state court

6   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8   previous state court decision, this court may consider both decisions to ascertain the reasoning of

9   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

10  federal claim has been presented to a state court and the state court has denied relief, it may be

11  presumed that the state court adjudicated the claim on the merits in the absence of any indication

12  or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

13  may be overcome by a showing "there is reason to think some other explanation for the state

14  court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

15  (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but

16  does not expressly address a federal claim, a federal habeas court must presume, subject to

17  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

18  ___, 133 S. Ct. 1088, 1091 (2013).

19         Where the state court reaches a decision on the merits but provides no reasoning to

20  support its conclusion, a federal habeas court independently reviews the record to determine

21  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

22  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

23  review of the constitutional issue, but rather, the only method by which we can determine whether

24  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

25  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

26  reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

27         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

28  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

13

1    just what the state court did when it issued a summary denial, the federal court must review the

2    state court record to determine whether there was any "reasonable basis for the state court to deny

3    relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

4    have supported, the state court's decision; and then it must ask whether it is possible fairminded

5    jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

6    decision of [the Supreme] Court." 562 U.S. at 102. The petitioner bears "the burden to

7    demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v.

8    Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

9         When it is clear, however, that a state court has not reached the merits of a petitioner's

10   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

11   habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

12   F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

13   **III. Petitioner's Claims**

14        **A. Suppression of Pre-trial and In-court Identifications**

15        On September 8, 2006, the trial court ruled that petitioner's statements made in response

16   to police interrogation were not admissible in the prosecution's case-in-chief at petitioner's trial

17   because interrogating detectives had failed to give petitioner warnings required under Miranda v.

18   Arizona, 384 U.S. 436 (1966). (Reporter's Transcript on Appeal (RT) at 78-79.) On that same

19   date, the trial court denied petitioner's motion to exclude from evidence pre-trial lineup

20   identifications and in-court identifications of petitioner by various witnesses. (Id. at 108.) In

21   petitioner's first ground for federal habeas relief, he claims that the trial court violated his right to

22   due process in denying his motion to exclude the pre-trial and in-court identifications from

23   admission at his trial. (ECF No. 32 at 20.) [2]

24        **1. State Court Decision**

25        In considering this claim on direct appeal, the state appellate court summarized

26   petitioner's arguments and the underlying facts:

27   _____

28   [2]   Page number citations such as this one are to the page numbers reflected on the court's
     CM/ECF system and not to page numbers assigned by the parties.

*/////*

### Suggestiveness of Identification Procedures

Johnson claims the court erred when it refused to suppress (1) the pretrial identifications made at live lineups by Timothy Meton, Rui Mar, Mathew Johnson, and Lidia Fretwell; (2) the pretrial identification made from a photo lineup by Jesus Fernandez; and (3) the in-court identifications made by these same witnesses, and, in particular, Mathew Johnson. Johnson asserts the procedures used to obtain the pretrial identifications were unduly suggestive, and that the procedures wrongfully tainted the in-court identifications. We disagree.

### A. Live lineups

### 1. Background information

Meton, Mar, Mathew, and Fretwell identified Johnson at live lineups. In each lineup, the suspects were presented to the witnesses simultaneously rather than sequentially. Citing to psychological journals, Johnson claims group lineups produce less reliable identifications and thus identifications at such lineups should be suppressed.

Johnson also faults the live lineups because he was thinner than the other suspects and because he was the only suspect who had a braid protruding from one side of his hat.

Johnson also claims that police suggestively tainted the lineup identifications by Meton and Mar by showing the witnesses photos before the live lineups. Police showed Meton a sequential photo lineup that included Johnson's photo, but Meton was unable to identify a suspect. Five days later, Meton viewed the live lineup. Johnson was the only person in the lineup whose photo had been included in the photo lineup. Meton identified Johnson as the suspect, but only after he asked the suspects to say "hurry up" and "underneath, too," two phrases the robber had used at the time of the robbery.

As for Mar, she was asked by a Roseville police sergeant to view still photos taken from the surveillance video of the Chetty murder posted on the Sacramento County Sheriff's Department Web site because the facts surrounding the two incidents were similar. Mar viewed the photos, recognized the suspect in them as the suspect who attempted to rob her, and reported her identification to the Roseville Police Department.

One week later, Mar attended a live lineup in Sacramento County, and she quickly identified Johnson as the person who had robbed her. Johnson claims the use of photos prior to the live lineups improperly tainted Meton's and Mar's pretrial identification of him.

Johnson, 183 Cal.App.4th at 270-71.

15

/////

On direct appeal the state appellate court rejected petitioner's challenges to the pretrial and in-court witness identifications, reasoning as follows:

**2. Analysis**

> We review de novo a trial court's ruling that a pretrial identification procedure was not unduly suggestive.  (People v. Kennedy (2005) 36 Cal.4th 595, 609, 31 Cal. Rptr.3d 160, 115 P.3d 472.)

> "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]"  (People v. Cunningham (2001) 25 Cal.4th 926, 989, 108 Cal. Rptr.2d 291, 25 P.3d 519.)

> "[D]efendant has the burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just speculation.'  [Citation.]  A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'  [Citation.]"

> "We have held that an identification procedure is considered suggestive if it 'caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]"  (People v. Cook (2007) 40 Cal.4th 1334, 1355, 58 Cal. Rptr.3d 340, 157 P.3d 950.)

> If the defendant fails to show that the identification procedures were unduly suggestive, we need not address any arguments regarding the identifications' reliability under the totality of the circumstances.  (People v. Cook, supra, 40 Cal.4th at p. 1355, 58 Cal. Rptr.3d 340, 157 P.3d 950; People v. Cunningham, supra, 25 Cal.4th at p. 989, 108 Cal. Rptr.2d 291, 25 P.3d 519.)

> Johnson has not shown that the live lineup procedures used here were unduly suggestive.  First, he provides no legal authority to support his claim that group lineups are inherently impermissibly suggestive, and we are aware of none.  Group lineups have long been an accepted identification procedure, and nothing in this case indicates we should question that format.

> Second, the lineup itself was not unduly suggestive.  Nothing in the lineup caused Johnson to "stand out" from the others in a way that

16

would suggest the witness should select him.  The lineup consisted of five Black men.  Each appears to be of similar age, complexion, and body type.  Each wore a blue cap and a gray sweatshirt over orange jail clothing and a t-shirt.  At least two of the five, defendant and one other, had braids or dreadlocks in their hair, while two others appear to have similar type of hair.  Viewed with the other suspects, defendant does not stand out in a way that would indicate to the witnesses they should have selected him.

Third, the use of photographs before Meton's and Mar's lineups was not impermissibly suggestive.  California and federal courts have rejected Johnson's argument, made against Meton's identification, that identification procedures are impermissibly suggestive if the defendant is the only person appearing in both a display of photographs and a subsequent lineup.  "[T]he fact that the defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process." (People v. Cook, supra, 40 Cal.4th at p. 1355, 58 Cal. Rptr.3d 340, 157 P.3d 950; see also People v. Wimberly (1992) 5 Cal. App.4th 773, 789, 7 Cal. Rptr.2d 152; United States v. Davenport (9th Cir.1985) 753 F.2d 1460, 1463.)

Regarding Mar's identification, Johnson has not submitted copies of the photos Mar viewed on the sheriff's Web site.  Thus, we cannot determine what prejudicial effect, if any, those photos could have had on Mar's subsequent identification of Johnson in the live lineup.  Although the photos were made from the surveillance video, we do not know what exactly they depicted.  We certainly cannot say the procedure was unnecessary.  A police sergeant from a different jurisdiction asked Mar to view the photos based on the similarity in the crimes and in order to solve the crime against Mar.  Under these circumstances, Johnson fails to demonstrate Mar's identification of him occurred under unduly suggestive procedures.

**B. Fernandez photo lineup identification**

Johnson faults the procedure the sheriffs used in obtaining Jesus Fernandez's pretrial identification.  Prior to showing Fernandez a photo lineup, a detective showed him the surveillance video from his own robbery.  After viewing the video and the photo lineup, Fernandez first identified two persons who could have been the robber, and then he identified Johnson as the robber.

Johnson acknowledges this type of procedure was approved in People v. Ingle (1986) 178 Cal.App.3d 505, 512–514, 223 Cal. Rptr. 723, but he nonetheless claims the procedure here tainted Fernandez's identification of him.  It did not.  "[U]nlike the recollections and descriptions of a human witness, the recorded memory of the video surveillance camera has little serious potential to mislead.  Indeed, its opposite potential to correct and enhance the reliability of an eyewitness identification in cases like the present would appear greater than its potential to cause an incorrect result.  Accordingly, we find nothing inherent in the procedure with which we deal in this case that can be said to be unnecessarily suggestive and conducive to irreparable mistaken identification."  (Id. at p.

17

513, 223 Cal. Rptr. 723.)

**C. In-court identifications, especially by Mathew Johnson**

Johnson argues the in-court identifications by the witnesses should have been suppressed due to their pretrial identification procedures. Having determined the pretrial procedures were not unduly suggestive, we agree the trial court correctly refused to suppress the witnesses' in-court identifications.

Johnson particularly attacks Mathew Johnson's in-court identification. Mathew, who previously identified Johnson at a live lineup, did not bring his glasses to court, so he was allowed to leave the witness stand and approach counsel table to make an identification of Johnson.

Later, defense counsel moved for a mistrial, claiming Mathew's identification was a suggestive identification procedure. The trial court disagreed with the argument and denied the motion. It explained: "I did this in the context of a very clear and unequivocal identification at the lineup which I found to be fair, and given the circumstances that Mr. Johnson is the only black male seated at the counsel table, the difference between this witness sitting at the witness stand with glasses on and looking at the counsel table to identify the black man there as being the robber or not being the robber is not distinguishable from being walked up to the counsel table and looking at the same person more closely."

As the trial court explained, its action in allowing Mathew to view Johnson at the counsel table did not cause Johnson to stand out any more than did the fact that defendant was the only Black man sitting at the counsel table. Someone could have given Mathew a pair of glasses, and the procedure would have been no different substantively. The court's action was not unduly suggestive.

Johnson faults the procedure because on cross-examination, Mathew stated Johnson had a tattoo on the left side of his neck. Mathew had never told anyone that fact before. Johnson claims this statement could have resulted only from the identification procedure. However, on further cross-examination, Mathew explained he recalled seeing the tattoo at the time of the robbery but he likely did not mention it to police because he was "stunned" over having been in a robbery. The matter thus went to the weight of Mathew's identification, not to its admissibility.

In sum, the identification procedures used in this case were not unduly suggestive.

Id. at 271-74.

**2. Petitioner's Arguments**

As he did in state court, petitioner challenges the identification procedures specific to each individual witness who testified at trial, as well as the cumulative effect of police procedures

18

1    allegedly designed to result in petitioner's identification as the robber.   With respect to witness

2    Timothy Meton, petitioner notes the following:  (1) Mr. Meton did not provide any details of the

3    robber's face in his initial description of the individual to police but was able to recall details

4    about the robber's gun and clothing, indicating that he did not pay close attention to the robber's

5    face; (2) the robber was in the store for only about 30 seconds; (3) prior to his identification of

6    petitioner as the robber, Mr. Meton saw a surveillance photo of murder victim Chetty's killer in

7    the Sacramento Bee; (4) prior to the live lineup Meton was shown a photographic lineup that

8    included petitioner's photo but he was still unable to identify anyone as the robber; and (5) "the

9    only person present (at the live lineup) who was also in the photo lineup was Petitioner."  (ECF

10   No. 32 at 23, 24; ECF No. 45 at 11.  <u>See also</u> Clerk's Transcript on Appeal (CT) at 446; ECF 32-

11   1.)  Petitioner argues that these factors cast doubt on the reliability of Meton's identification of

12   petitioner as the robber.  He also contends that "law enforcement gave Meton a clue that the

13   person he was supposed to identify was the only person whose photograph he had seen."  (ECF

14   No. 45 at 11.)  Petitioner asserts that "clearly the live identification was influenced by the prior

15   photographic lineup."  (ECF No. 32 at 23.)

16        Petitioner also challenges the identification of the robber provided by Rui Mar.  He claims

17   her identification was unreliable because she mainly described the robber's clothing and weapon

18   when speaking to the police after the robbery, but did not provide details about the robber's facial

19   features.  (ECF No. 32 at 24; CT at 447.)  He argues that Mar's identification was not based on

20   her independent recollection of the robbery, but on her memory of the suspect depicted in the

21   surveillance photos from the Shell station robbery and murder, which she had been shown prior to

22   identifying petitioner as the robber at the live lineup.  (ECF No. 32 at 24; ECF No. 45 at 11.)

23        With regard to Mathew Johnson, petitioner argues that, during the robbery, Johnson

24   "appeared to be focused on the gun, as he was able to describe it as dark, dirty, partly corroded

25   and having an orange stripe on the front."  (ECF No. 32 at 24.)  He further argues that before

26   viewing petitioner at close range in the courtroom, Johnson's descriptions of the robber had been

27   only "generic."  (<u>Id.</u> at 25.)  After encountering petitioner in the courtroom, however, Johnson's

28   description of the robber became much more specific.  (<u>Id.</u>)  Petitioner complains that Johnson

1   "was allowed to leave the witness stand and walk right up to the defendant – the only African

2   American at the defense table – and identify the defendant as his assailant." (ECF No. 45 at 13.)

3   He notes that Johnson had never mentioned that the robber had a tattoo before he observed

4   petitioner at close range in the courtroom. (Id.) Petitioner also notes that Johnson did not identify

5   petitioner as the robber until ten days after the robbery. (ECF No. 32 at 25.)

6       Petitioner claims that Jesus Fernandez' identification at the photo lineup was unduly

7   influenced by the surveillance photo of his own robbery, which police presented to him

8   immediately prior to the photo lineup. (ECF No. 32 at 23, 24; ECF No. 45 at 11.) He notes that

9   Fernandez had difficulty choosing a suspect even under these circumstances. (Id.) He argues that

10  Fernandez's identification of petitioner as the robber 'was enhanced not by his own recollection

11  of his assailant but by his view of a photograph." (ECF No. 45 at 11.)

12      Finally, petitioner notes that Lidia Fretwell, who identified petitioner as the robber from a

13  photo lineup, initially gave police a detailed description only of the robber's clothing but not his

14  facial features. (ECF No. 32 at 25.) He also notes that Fretwell viewed the photo lineup more

15  than two weeks after the robbery. (Id.) Petitioner argues that Fretwell's identification, and that of

16  Mathew Johnson, were suspect because of their "limited opportunity to view the gunman and the

17  length of time that had transpired from the robbery to the identification procedures." (ECF No.

18  45 at 12.)

19      Petitioner argues that all of the witness identifications of himself as the robber were

20  tainted by suggestive information supplied to those witnesses by the police. (ECF No. 32 at 20.)

21  He also contends that "none of the witness identifications were reliable when considered in light

22  of the witnesses' limited opportunities to view the criminal at the instant of the crime, the

23  witnesses' degree of attention, the accuracy of their prior descriptions of their assailants, their

24  level of certainty at the time of the confrontations, and the time between the crimes and the

25  confrontations." (Id.) Petitioner further argues that each of the identifications were unreliable

26  because: (1) the witnesses were not African-American and therefore not the same race as

27  petitioner; (2) some of the witnesses were uncertain of their choice of petitioner at the time of

28  their identification; and (3) the witnesses' prior descriptions of the robber tended to be vague,

indicating they did not really get a good luck at the robber.  (Id. at 22; ECF No. 45 at 10, 15.)

Petitioner asserts that "all of the clerks were focused on the clothing and the weapon, but not the

assailant's face."  (ECF No. 32 at 24.)  Finally, petitioner argues that the live lineup itself was

unduly suggestive because he "was thinner than the other suspects and because he was the only

suspect in the lineups who had a braid protruding from one side of his hat, thereby calling

particular attention to him."  (ECF No. 32 at 22.)

     In general, petitioner asserts that the state court decisions rejecting his challenges to the

eyewitness identification evidence constituted "unreasonable applications of clearly established

federal law in ignoring the impact of the tainted identification procedures" and that the California

Court of Appeal ignored the "cumulative effect of impermissible methods."  (ECF No. 45 at 11,

15.)

### 3.  Applicable Law

     The Due Process Clause of the United States Constitution prohibits the use of

identification procedures which are "unnecessarily suggestive and conducive to irreparable

mistaken identification."  Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds

by Griffith v. Kentucky, 479 U.S. 314, 326 (1987).  A suggestive identification violates due

process if it was unnecessary or "gratuitous" under the circumstances.  Neil v. Biggers,  409 U.S.

188, 198 (1972).  An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the

witness 'This is the man.'"  Foster v. California, 394 U.S. 440, 443 (1969).  "[E]ach case must be

considered on its own facts" and whether due process has been violated depends on "the totality

of the surrounding circumstances."  Simmons v. United States, 390 U.S. 377, 383 (1968) (citing

Stovall, 388 U.S. at 302).

     "Even when the police use [a suggestive identification] procedure, suppression of the

resulting identification is not the inevitable consequence."  Perry v. New Hampshire,  ___ U.S.

___, ___, 132 S. Ct. 716, 719 (2012).  Courts must assess each case to determine whether

improper police conduct created a "substantial likelihood of misidentification."  Biggers, 409

U.S. at 201.  "Where the 'indicators of [a witness'] ability to make an accurate identification' are

'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be

1   /////

2   suppressed." Perry, 132 S. Ct. at 719 (quoting Manson v. Brathwaite, 432 U.S. 98, 114, 116

3   (1977)).

4       Factors indicating the reliability of an identification include:  (1) the opportunity to view

5   the criminal at the time of the crime; (2) the witness' degree of attention (including any police

6   training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the

7   confrontation; and (5) the length of time between the crime and the identification.  Brathwaite,

8   432 U.S. at 114 (citing Biggers, 409 U.S. at 199-200).  Additional factors to be considered in

9   making this determination are "the prior opportunity to observe the alleged criminal act, the

10  existence of any discrepancy between any pre-lineup description and the defendant's actual

11  description, any identification prior to lineup of another person, the identification by picture of

12  the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the

13  lapse of time between the alleged act and the lineup identification." United States v. Wade, 388

14  U.S. 218, 241 (1967).  The "central question," is "whether under the 'totality of the

15  circumstances' the identification is reliable even though the confrontation procedure was

16  suggestive." Biggers, 409 U.S. at 199.  See also United States v. Drake, 543 F.3d 1080, 1088

17  (9th Cir. 2008).

18      If the flaws in the pretrial identification procedures are not so suggestive as to violate due

19  process, "the reliability of properly admitted eyewitness identification, like the credibility of the

20  other parts of the prosecution's case is a matter for the jury." Perry, 132 S. Ct. at 719; Foster, 394

21  U.S. at 443 n.2.  See also Brathwaite, 432 U.S. at 116 ("[j]uries are not so susceptible that they

22  cannot measure intelligently the weight of identification testimony that has some questionable

23  feature"); United States v. Jones, 84 F.3d 1206, 1210 (9th Cir. 1996) (unless the procedure used is

24  so suggestive that it raises a "very substantial likelihood of irreparable misidentification," doubts

25  go to the weight, not the admissibility, of the evidence and "identification evidence is for the jury

26  to weigh") (quoting United States v. Kessler, 692 F.2d 584, 586-87 (9th Cir. 1982)).  On the other

27  hand, if an out-of-court identification is inadmissible due to unconstitutionality, a related in-court

28  identification is also inadmissible unless the government establishes that it is reliable by

introducing "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." Wade, 388 U.S. at 240. See also United States v. Hamilton, 469 F.2d 880, 883 (9th Cir. 1972) (in-court identification admissible, notwithstanding inherent suggestiveness, where it was obviously reliable).

Under California law, an extrajudicial identification violates a defendant's right to due process only if the identification procedure was unduly suggestive and unnecessary, and the identification itself, under the totality of the circumstances, was unreliable. People v. Carpenter, 15 Cal.4th 312, 366-367 (1997). The defendant has the burden of showing the identification procedure was unfair "as a demonstrable reality, not just speculation." People v. DeSantis, 2 Cal.4th 1198, 1222 (1992). See also People v. Ochoa, 19 Cal.4th 353, 412 (1998). If the challenged procedure is not impermissibly suggestive, the reviewing court's inquiry into the due process claim ends. Ochoa, 19 Cal.4th at 412; DeSantis, 2 Cal.4th at 1224 n.8. As the California Supreme court has stated,

> The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary (Manson v. Brathwaite [(1977)] 432 U.S. [98,] 104-107 . . .; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation (id. at pp. 109-114 . . .). If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.

DeSantis, 2 Cal.4th at 1222.

In California, generally, a pretrial identification procedure is deemed unfair only if it suggests the identity of the person suspected by the police before the witness has made an identification. People v. Brandon, 32 Cal.App.4th 1033, 1052 (1995). The crucial question under California law is whether the defendant was singled out from the others in such a way that his identification was a foregone conclusion under the circumstances. People v. Faulkner, 28 Cal.App.3d 384, 391 (1972) disapproved on other grounds in People v. Hall, 28 Cal.3d 143, 156, fn.8 (1980) and People v. Bustamonte, 30 Cal.3d 88, 102 (1981)).

23

1    /////

2          **4. Analysis**

3          In order to prevail on his challenges to the eyewitness identifications admitted into

4    evidence at his trial, petitioner must demonstrate that the California Court of Appeal's

5    adjudication of the claim was "objectively unreasonable" and "so lacking in justification that

6    there was an error well understood and comprehended in existing law beyond any possibility for

7    fairminded disagreement." Richter, 131 S. Ct. at 786-87.  Petitioner has failed to make the

8    required showing.

9          The undersigned agrees with the California Court of Appeal's conclusion that the live

10   lineup procedure utilized in petitioner's case was not unduly suggestive.  Photographs of the

11   lineup participants have been provided to this court.  (See Resp't's Lod. Doc. 15.)  As noted by

12   the state appellate court, petitioner was not the only participant with braids in his hair or with hair

13   protruding from the bottom of his baseball cap, and there were several participants who appeared

14   to be approximately the same size as petitioner.  (See Id.)   None of the lineup participants stand

15   out as being significantly different in appearance from the others.  The selection of participants in

16   the lineup was not "unnecessarily suggestive" and does not appear to this court to have been

17   "conducive to irreparable mistaken identification." Stovall, 388 U.S. at 302.  Accordingly,

18   standing alone, the live lineup procedure employed did not violate petitioner's right to due

19   process.  See United States v. Burdeau, 168 F.3d 352, 357 (9th Cir. 1999) (photo lineup was not

20   impermissibly suggestive where the defendant's picture was placed in the center of the array, was

21   darker than the rest, and was the only one in which the eyes were closed); United States v.

22   Carbajal, 956 F.2d 924, 929 (9th Cir. 1992) (array not impermissibly suggestive when

23   defendant's photograph was only one in which individual wore wig and had bruises on face);

24   United States v. Johnson, 820 F.2d 1065, 1073 (9th Cir. 1987) (photographic array was not

25   impermissibly suggestive when defendant's photograph was hazier than others;  United States v.

26   Sambrano, 505 F.2d 284, 286 (9th Cir. 1974) (photographic array in which defendant's

27   photograph was darker and clearer was not impermissibly suggestive); see also United States v.

28   Carr, 761 F.3d 1068, 1075-76 (9th Cir. 2014) (fact that witness felt pressured and had an

24

1   /////

2   incentive to cooperate in the hope of receiving a lesser charge or a lighter sentence did not create

3   an impermissibly suggestive lineup).

4        As described above, Meton and Mar identified petitioner at the live lineup after having

5   previously viewed a photograph of petitioner.  Specifically, a sequential photo lineup was shown

6   to Meton and still photos from the video of the Chetty murder were shown to Mar.  Witness

7   Fernandez was shown the surveillance video from his own robbery.  As the California Court of

8   Appeal correctly noted, the fact that petitioner was the only individual common to both the photos

9   and the live lineups shown to witnesses did not, without more, violate due process.  This is true

10  even though the video shown to Fernandez was from his own robbery.  See United States v.

11  Davenport, 753 F.2d 1460, 1463 (9th Cir. 1985) ("The fact that [robbery suspect] was the only

12  individual common to the photo spread and the lineup cannot, without further indicia of

13  suggestiveness, render the lineup conducive to irreparable misidentification."); United States v.

14  Monks, 774 F.2d 945, 956 (9th Cir. 1985) (identification procedures were not impermissibly

15  suggestive where witnesses were shown a surveillance photograph of their bank robber just

16  before they identified the defendant in a photographic lineup); United States v. Stubblefield, 621

17  F.2d 980, 983 (9th Cir. 1980) ("[t]he rights of the accused are not jeopardized when, as here, the

18  recollection of an eyewitness is refreshed by the use of photographs of the crime itself").  United

19  States v. Portillo, 633 F.2d 1313, 1324 (9th Cir. 1980) (rejecting the argument that "showing an

20  eyewitness surveillance photographs taken of the robbery as it occurred was impermissibly

21  suggestive").  This is not a situation where witnesses were shown two live lineups in which

22  petitioner was the only participant in common, as was the case in Foster.  Nor is this a case where

23  the police specifically emphasized petitioner as the robber in some overly suggestive way.  See

24  Simmons, 390 U.S. at 383-84 (noting that "improper employment of photographs by police may

25  sometimes cause witnesses to err in identifying criminals").  Accordingly, the fact that witnesses

26  Merton, Mar, and Fernandez each saw a photograph of petitioner prior to participating in the live

27  lineup procedure at which they identified him as the robber did not render the procedure overly

28  suggestive or conducive to a mistaken identification.

1   /////

2      This court also agrees with the California Court of Appeal that the in-court identification

3   of petitioner by witness Mathew Johnson was not unduly suggestive.  As noted by the state

4   appellate court, there was no material difference between having Johnson view petitioner from

5   the witness stand with his glasses on as opposed to allowing him to approach petitioner until he

6   could see him as clearly as if he had been wearing glasses on the witness stand.  Although

7   Johnson mentioned for the first time only after seeing petitioner up close that the robber had a

8   tattoo, Johnson later explained on cross-examination that he didn't mention the robber's tattoo to

9   the police because he was too stunned to do so immediately after having been robbed.

10  (Reporter's Transcript on Appeal (RT) at 1017, 1019.)  In addition, this issue was fully explored

11  in front of the jury during Mr. Johnson's cross-examination.  (Id. at 1017-21.)  Petitioner's jury

12  was thus able to fully evaluate the reliability of Johnson's identification as well as of his specific

13  statement that the robber had a tattoo.

14      There is also no evidence in this case that improper police conduct in setting up these

15  identification procedures created a "substantial likelihood of misidentification."  Biggers, 409

16  U.S. at 201.  Although many of these identification procedures were conducted more than 10 days

17  after the robberies, witnesses Fernandez, Mar, Mathew Johnson, and Fretwell all identified

18  petitioner as the robber.  Even though Meton was unable to identify anyone in a photo lineup 15

19  days after the robbery, he identified petitioner as the robber in a subsequent live lineup and again

20  at petitioner's trial.  All of the witnesses were in close proximity to petitioner during the robberies

21  and, with the possible exception of witness Fretwell, spoke to the robber directly during events

22  thereby meriting their full attention.  Regardless of whether their initial descriptions of the robber

23  to police were vague, they had had sufficient exposure to the individual who robbed them to

24  recognize him later if they saw him.  The undersigned does not find that in this case the

25  "'indicators of [the witnesses'] ability to make an accurate identification'" were "'outweighed by

26  the corrupting effect' of law enforcement suggestion."  Perry, 132 S. Ct. at 719.  In short, there is

27  no evidence before this court case suggesting that the circumstances gave rise to a substantial

28  likelihood of mistaken identification or that the identifications of petitioner by witnesses were

1   otherwise unreliable.  See Biggers, 409 U.S. at 198-99; Johnson, 820 F.2d at 1072.  Because the

2   identification procedures utilized in the case were not unduly suggestive, the trial court was not

3   required to suppress the witnesses' in-court identifications of petitioner.  Rather, the reliability of

4   those witness identifications was a matter for the jury consider and ultimately to decide.  Perry,

5   132 S. Ct. at 719.  See also Angov v. Holder, 736 F.3d 1263, 1272 (9th Cir. 2013) ("The way to

6   deal with unreliable evidence, the Supreme Court tells us, is via the adversary system, which

7   includes the ability to confront witnesses, the assistance of counsel, jury instructions, the burden

8   of proof and the right to introduce contrary evidence.")

9          For the reasons set forth above, the undersigned concludes that the identification

10  procedures that were employed in this case did not violate petitioner's right to due process.  The

11  decision of the California Court of Appeal to the same effect is not contrary to or an unreasonable

12  application of federal law.  Accordingly, petitioner is not entitled to federal habeas relief with

13  respect to this claim.

14          **B.  Exclusion of Third-Party Culpability Evidence**

15          In his next ground for relief, petitioner claims that the trial court violated his rights to a

16  fair trial, to present a defense of third-party culpability, and to due process when it improperly

17  relied on petitioner's suppressed confession to deny his request to introduce testimony at trial

18  from Thomas Claussen, the gas station clerk at the Arco/Valero station that was robbed, that the

19  gunman in that robbery "was darker" than petitioner and the four other men he viewed in a live

20  lineup.  (ECF No. 32 at 7.)  Petitioner was not charged with the Arco/Valero robbery, even

21  though he confessed to committing it during his police interrogation.  However, petitioner argues

22  that evidence that the robber in that case was "darker" than he, would tend to raise a reasonable

23  doubt as to whether he was the perpetrator of the robberies he *was* charged with.  (Id. at 28.)

24  Petitioner points out that his defense theory was that the robberies charged against him were

25  actually committed by his cousin Thaddeus Taylor, "who shared a bedroom with Mr. Johnson,

26  had access to a handgun and had similar facial features, although Mr. Taylor had darker skin."

27  (Id.)  Petitioner notes that a witness who saw the face of the man leaving the Shell station after

28  the Chetty shooting identified a photograph of Thaddeus Taylor as the possible perpetrator of that

robbery and failed to identify petitioner as the robber at a subsequent photo lineup.  (Id. at 27.)
Petitioner argues that the trial court's refusal to allow petitioner to call Claussen to testify at his
trial about this matter, coupled with the court's refusal to allow the introduction into evidence of
exculpatory statements made by petitioner to his girlfriend, "thwarted the defense efforts" to
place the blame for the robberies and the shooting on Thaddeus Taylor.  (Id.)

### 1. State Court Decision

The California Court of Appeal summarized the background to this claim of evidentiary
ruling error, as follows:

> **Excluding Evidence of Uncharged Robbery under Evidence
> Code Section 352 Based on Suppressed Confession**
>
> Johnson claims the trial court erred when it relied on his suppressed
> confession to the uncharged robbery of Thomas Claussen at the
> Arco/Valero station to determine the evidence from that robbery,
> which Johnson claimed was exculpatory, was inadmissible under
> Evidence Code section 352 as misleading and likely to confuse the
> jury.  We conclude the trial court did not err by relying on the
> suppressed confession in this instance.
>
> **A. Background information**
>
> Originally, both Johnson and Holmes were charged with the June
> 30, 2005 robbery of Thomas Claussen at the Arco/Valero gas
> station at San Juan Avenue and Winding Way.  The prosecution
> later dropped the charge against Johnson but continued to press the
> charge against Holmes.
>
> After his arrest, Johnson confessed to detectives that he committed
> the Claussen robbery and that he wore the Kobe Bryant jersey seen
> on him on the store's surveillance video.  The trial court, however,
> suppressed all of Johnson's statement from being used in the
> People's case-in-chief because Johnson did not receive an adequate
> Miranda warning.  The statement was admissible only to impeach
> defendant if he testified, as the court found the statement was not a
> product of coercion.
>
> Holmes also admitted her involvement in the Claussen robbery.
> She informed detectives after her arrest that she drove Johnson to
> the Arco/Valero station.  She claimed Johnson did not say anything
> to her afterwards.  She did not know what Johnson had done there
> until a couple of days later when Johnson told her.
>
> Claussen, the victim of that robbery, viewed a live lineup about two
> weeks after the incident.  Johnson was in the lineup.  Claussen was
> unable to identify anyone as the robber.  Claussen wrote he was
> unable to identify anyone because "the guy who came in was
> darker."

/////

During motions in limine, and after the People had dropped the Claussen robbery charge against Johnson, Johnson's attorney asked the court to allow Johnson's jury to hear evidence of this uncharged robbery that would otherwise have been presented only to Holmes's jury. Defense counsel claimed the evidence was relevant and exculpatory because Claussen had stated the culprit was darker skinned than those in the lineup and thus had eliminated Johnson as a suspect.

The prosecutor urged the court not to admit the evidence pursuant to Evidence Code section 352 (Section 352).FN4 The prosecutor argued that admitting the evidence in Johnson's case as exculpatory was a fraud on the court because Johnson had confessed in his suppressed statement that he committed this robbery.

FN4. Section 352 authorizes a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The trial court denied Johnson's motion, but it did so without prejudice if Johnson chose to develop an affirmative defense arguing that his cousin, Thaddeus Taylor, was the gunman or had performed other robberies.

Thaddeus testified at trial. He acknowledged his complexion is darker than Johnson's. Both he and Johnson wore their hair in braids at times. Johnson wore an earring in his left ear, and Natalie and Chelsea testified that Thaddeus wore an earring. (Thaddeus denied he wore an earring.) Both Johnson and Thaddeus had their tongues pierced. When Natalie first met Johnson, she sometimes confused him with Thaddeus because they looked similar. A friend of Natalie's who had been dating Thaddeus also confused Johnson and Thaddeus.

One difference between Johnson and Thaddeus was that Johnson has a tattoo on the left side of his neck with the words, "Smile now cry later." Thaddeus did not have a tattoo.

Of relevance to Johnson's case, Thaddeus stated he and Johnson shared a room at his father's house in 2005. Thaddeus's father, Fred Taylor, required Thaddeus and Johnson to have jobs and pay rent in order to stay at the house. Thaddeus and Johnson had worked at the same drug store for a time, but both had quit and neither was working at the time of the crimes. They shared each other's clothes, and Thaddeus owned a Kobe Bryant jersey like the one the Claussen robber wore. Defendant Holmes was one of Thaddeus's friends, and she had given him rides a couple of times in her car. Thaddeus knew where Johnson kept his gun. A few days after Chetty's murder, Thaddeus showed detectives where Johnson's gun was hidden inside a speaker in his bedroom. Thaddeus denied committing any of the robberies or the murder.

29

1 | /////

2   Before Thaddeus completed his testimony, Johnson filed a motion
3   asking the court to reconsider its ruling that excluded evidence of
    the uncharged Claussen robbery in his trial.   Johnson asserted
    Claussen's failure to identify him, and, in light of Thaddeus's
4   darker complexion, Claussen's statement that the robber was darker
    than him, were relevant facts in opposition to the prosecution's
5   showing of a pattern in all of the robberies.  He also noted a darker
    Black male was seen purchasing bullets at the Big 5 store with
6   Johnson, Holmes, and Schroeder.   Johnson argued his prior
    confession to the Claussen robbery was irrelevant and could not be
7   considered because the court had suppressed his statement.

8   At a hearing on the motion, Johnson specifically raised the defense
    of third party culpability as another basis for admitting the
9   evidence.  The perpetrator of the Claussen robbery was wearing a
    Kobe Bryant jersey, Thaddeus owned such a jersey, and a detective
10  had allegedly commented to Thaddeus during an interview that he
    looked like the person depicted in a surveillance photo from the
11  Claussen robbery.

12  The trial court denied the motion to modify its prior order.  The
    court researched the issue of whether it could rely on the suppressed
13  confession in this instance and found no precedent.   From that
    point, the court reasoned as follows:
14

15  "So that leaves me with a situation that there is an uncharged
    robbery and that the only reason not to allow Mr. Johnson to
16  present it to this jury is that the Court is possessed of this
    knowledge:  That out of a suppressed statement, a confession, the
17  defendant admitted doing that robbery and wearing that shirt, and
    the jury does not know that; and out of an admissible statement, but
18  not in Mr. Johnson's trial, the co-defendant Ms. Holmes has said
    that the defendant did that robbery.

19  "One approach, obviously, would be for the Court to just step back
    and say that evidence is suppressed and it cannot be considered;
20  there is no issue before me.  Once I found that there's third-party
    culpability evidence that was otherwise relevant, it goes before the
21  jury; or that a third-party culpability defense is valid and that if
    there's third-party culpability evidence otherwise relevant, it goes
22  before the jury.

23  "But to do that, I would have to be complicitous in putting that
    misleading information before the jury, which I think would be
24  contrary, among other things, to [Section] 352 of the Evidence
    Code, although, plainly, I have the discretion to that.
25

26  "But more fundamentally, contrary to the Court's responsibility to
    the integrity of the judicial system and of the trial itself, the
27  integrity of the system has to stand for something, and if the Court
    were to consider what's before me and affirmatively conclude that
28  the uncharged offense which the Court makes a factual finding is
    something that the defendant and not Mr. Taylor did based upon the

1    defendant's own statement and the statement of Ms. Holmes, the

2    Court would be complicitous in putting inaccurate, confusing and
     misleading information before the jury.

3

4    "The <u>Miranda</u> holding was designed to protect the defendant.  It
     was not intended to give him a sword to go after the other side.  If I
     in suppressing the <u>Miranda</u> – suppressing the confession insofar as

5    it did violate <u>Miranda</u>, which it did, and even though the confession
     itself was voluntary, uncoerced and reliable, if I extend that to do

6    more than simply prevent the People from using it in their case and
     allow the defendant to rely on it [the exclusion] to put misleading

7    information in front of the jury, then I think I'm compromising the
     integrity of the trial process, and I would go a step further in

8    compromising the integrity of the <u>Miranda</u> holding itself.

9    "I'm mindful that if the defendant were to take the stand, which
     plainly he wouldn't if the Court allowed this uncharged count in,

10   that the People could introduce his confession to impeach him.

11   "There are a number of ways to address that consideration.  One
     would be to say to the defendant well, you may put on the evidence

12   of the uncharged offense, but now the district attorney should be
     entitled by analogy to what would happen if you took the stand

13   yourself, Mr. Johnson, and testified to apprise the jury of your
     contrary prior statement.  There is no case law that stands for that

14   proposition and I'm not going to do that because I think the proper
     thing to do would be to simply conclude that [a voluntary,]

15   uncoerced, reliable but properly suppressed confession pursuant to
     <u>Miranda</u> in which the defendant admits to an uncharged count that

16   the defendant is thereby precluded from presenting evidence that
     another person committed that uncharged count to advance a third-

17   party culpability defense.  Certainly the defendant can take the
     stand and advance the argument, but I don't think he should be

18   permitted to put before the jury through other witnesses information
     which he knows to be untrue.

19

20   "<u>Miranda</u> is a defensive, not an offensive, mechanism.  It's to
     protect the defendant, not to pull the wool over the jury.  [¶] . . . [¶]
     "[I]t seems to me that the proper course is to preclude the defendant

21   from putting this information in front of the jury through proxy.  If
     he wishes to testify and subject himself to his prior inconsistent

22   statement on that, that's certainly his option."

23   <u>Johnson</u>, 183 Cal.App.4th at 274-78.

24       On direct appeal, the California Court of Appeal rejected petitioner's argument that the

25   trial court's evidentiary ruling excluding evidence of Claussen's remarks violated his right to due

26   process.  The state appellate court reasoned as follows:

27       Before us, Johnson claims the trial court's ruling is incorrect.  He
         asserts that by excluding the third-party culpability evidence based

28       on his suppressed confession, the court wrongly set aside the

31

constitutional presumption of innocence and made its own determination that Johnson was guilty of committing the Claussen robbery by relying on the inadmissible confession. He asserts the court was required to apply the normal standard of admissibility of third-party culpability evidence, and this evidence satisfied that standard and was not unduly prejudicial under Section 352.

**B. Analysis**

Johnson appears to have modified his direct attack under <u>Miranda</u>. He now argues the court's reliance on the confession as the basis for not admitting the Claussen robbery evidence amounted to a violation of the presumption of innocence that attached to him at trial. In other words, Johnson claims the trial court applied the presumption of innocence differently to him, because he was a confessing defendant, than it would have applied the presumption to a nonconfessing defendant. He asserts the court determined Johnson was guilty of committing the uncharged robbery based on his confession, and it thus determined the third party culpability evidence was inadmissible because it had already found Johnson to be guilty of that crime. The court's doing so, Johnson claims, ultimately denied him his right to present a defense, particularly in light of the rule of <u>Miranda</u>.

Johnson's argument misstates the trial court's action, and it misunderstands how the presumption of innocence and the right to present a defense apply to his case. The court did not find Johnson guilty of the uncharged robbery. It concluded only that his confession was relevant, reliable, and admissible for the limited purpose of the court's weighing the prejudicial effect of admitting the Claussen robbery evidence.

The presumption of innocence does not prohibit a court from weighing the credibility and prejudicial nature of third party culpability evidence under Section 352. The presumption is not irrebuttable, as Johnson's argument implies. Any competent evidence which tends to rebut the presumption is admissible, and the presumption is overcome by proof of guilt beyond a reasonable doubt. (<u>People v. Yeager</u> (1924) 194 Cal. 452, 486, 229 P. 40.)

Considering and weighing inculpatory evidence does not violate the presumption of innocence. "It is true, as suggested by appellant, that where two conclusions may reasonably be drawn concerning the defendant's conduct, one assigning a guilty and the other an innocent purpose thereto, it is the law that innocence will be presumed [by the jury], rather than guilt. But to give due weight to the presumption of innocence does not require that jurors [or, in this instance, the court] blind their eyes and shackle their reason in viewing the evidence and in judging the defendant's intentions." (<u>People v. McDougal</u> (1925) 74 Cal. App. 666, 672, 241 P. 598.) Certainly if a jury may weigh evidence without voiding the presumption of innocence when fulfilling its factfinding responsibilities and deciding his guilt, the court may weigh evidence without violating defendant's presumption of innocence when fulfilling its factfinding responsibilities to decide whether to

admit evidence under Section 352.

Here, the court accorded great weight to Johnson's suppressed confession, and rightly so. Johnson made his confession voluntarily, and Holmes corroborated Johnson's admission in her confession. The court did not violate the presumption of innocence in making this factual determination.

In short, the presumption is not a bar to the court weighing evidence when called upon to do so. Johnson cites no case that so much as even intimates the presumption of innocence would interfere with a court's weighing of evidence when determining admissibility under Section 352. The presumption simply does not apply in the manner Johnson asserts.

Nor does the court's weighing of evidence under Section 352 deny Johnson a right to present a defense of third-party culpability. Our Supreme Court faced this same argument in People v. Hall (1986) 41 Cal.3d 826, 226 Cal. Rptr. 112, 718 P.2d 99, and rejected it. The court wrote: "Defendant contends his constitutional right to present a defense precludes any application whatever of [Evidence Code] section 352 to third-party culpability evidence: even remote evidence of motive without more, he argues, might raise a 'reasonable doubt' of guilt. Indeed, defendant insists, the concept of reasonable doubt is itself so elusive that any attempt to weigh the probative value of such evidence must fail. He asserts that no amount of time spent presenting such a defense could be regarded as 'undue,' and the only prejudice the court must avert is 'emotional bias.' [¶] The claim does not withstand scrutiny. As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] As we observed in [People v. Mendez (1924) 193 Cal. 39 [223 P. 65]] this principle applies perforce to evidence of third-party culpability: 'if evidence of motive alone upon the part of other persons were admissible, . . . in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased . . . .' (People v. Mendez, supra, 193 Cal. at p. 52 [223 P. 65].) Trials must reach an end, and that end must be logical. (Ibid.)" (People v. Hall, supra, 41 Cal.3d at pp. 834–835, 226 Cal. Rptr. 112, 718 P.2d 99, fn. omitted, original emphasis.)

Even without the Claussen robbery evidence, Johnson was still able to present his third-party culpability defense. The jury heard all of the testimony concerning the similarities between Johnson and Thaddeus. They looked similar, they lived together, they shared clothes, and they both were unemployed and needed money to pay rent. Thaddeus knew Holmes. He also knew where Johnson kept his gun. There was even evidence that one of the witnesses who came upon the murder scene, when shown two photo lineups, excluded Johnson as the suspect but included Thaddeus as someone

who resembled the suspect.  Defense counsel also argued to the jury that Thaddeus was the perpetrator.  The court's ruling did not deny Johnson his right to present this defense.

Thus, the presumption of innocence and the right to present a defense did not prevent the court from weighing all of the evidence before it to determine whether the Claussen robbery evidence would be misleading and prejudicial.  The only question, then, is whether Johnson's Fifth Amendment right not to incriminate himself and the Miranda rule prevented the court from relying on the suppressed confession when it ruled under Section 352.  We conclude it did not.

The Miranda exclusionary rule is a prophylactic and constitutional rule employed to protect against violations of the Fifth Amendment's self–incrimination clause as applied to the states under the Fourteenth Amendment.  (United States v. Patane (2004) 542 U.S. 630, 636, 124 S. Ct. 2620, 2625, 159 L.Ed.2d 667, 674–675 (plur. opn.) (Patane); Dickerson v. United States (2000) 530 U.S. 428, 444, 120 S. Ct. 2326, 2336, 147 L.Ed.2d 405, 420 (Dickerson).)  The rule fosters the "general goal of deterring improper police conduct" and "the Fifth Amendment goal of assuring trustworthy evidence . . . " (Oregon v. Elstad (1985) 470 U.S. 298, 309, 105 S. Ct. 1285, 1293, 84 L.Ed.2d 222, 231–232 (Elstad).)

Miranda, however, has never been interpreted as barring all use of suppressed confessions at trial.  "Miranda barred the prosecution from making its case with statements of an accused made while in custody prior to [being warned or] having or effectively waiving counsel.  It does not follow from Miranda that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."  (Harris v. New York (1971) 401 U.S. 222, 224, 91 S. Ct. 643, 645, 28 L.Ed.2d 1, 4 (Harris).)  "[T]he Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted." (Elstad, supra, 470 U.S. at p. 307, 105 S. Ct. 1285.)

The United States Supreme Court has carved out exceptions to the exclusionary rule upon "recognition that the concerns underlying the Miranda [ ] rule must be accommodated to other objectives of the criminal justice system."  (Patane, supra, 542 U.S. at p. 644, 124 S. Ct. 2620 (conc. opn. of Kennedy, J.).)  In James v. Illinois (1990) 493 U.S. 307, 110 S. Ct. 648, 107 L.Ed.2d 676 (James), the high court set forth the balancing test it uses to establish exceptions to the Miranda exclusionary rule.  Under that test, exceptions to the rule are made "where the introduction of reliable and probative evidence would significantly further the truth-seeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility.' [Citation.]" (James, supra, 493 U.S. at p. 311, 110 S. Ct. 648 fn. omitted.)

34

1   /////

2       In particular, the Miranda exclusionary rule does not prohibit the
3   introduction of a voluntary, uncoerced and reliable but unwarned
    statement made by a defendant in order to prevent the defendant
    from committing perjury or a fraud on the court. "'It is one thing to
4   say that the Government cannot make an affirmative use of
    evidence unlawfully obtained. It is quite another to say that the
5   defendant can turn the illegal method by which evidence in the
    Government's possession was obtained to his own advantage, and
6   provide himself with a shield against contradiction of his
    untruths.'" (Harris, supra, 401 U.S. at p. 224, 91 S. Ct. 643 quoting
7   Walder v. United States (1954) 347 U.S. 62, 65, 74 S. Ct. 354, 356,
    98 L.Ed. 503, 507.)
8
        Harris authorized impeaching a testifying defendant with his
9   voluntary but suppressed confession. "The Court in Harris rejected
    as an 'extravagant extension of the Constitution,' the theory that a
10  defendant who had confessed under circumstances that made the
    confession inadmissible, could thereby enjoy the freedom to 'deny
11  every fact disclosed or discovered as a "fruit" of his confession,
    free from confrontation with his prior statements' and that the
12  voluntariness of his confession would be totally irrelevant.
    [Citations.]" (Elstad, supra, 470 U.S. at p. 307, 105 S. Ct. 1285.)
13
        Although Harris concerned the admission of a defendant's
14  suppressed statement to impeach the defendant when he testifies at
    trial, the ruling's principle of admitting the evidence in a context
15  other than the prosecution's case-in-chief so as to avoid false
    testimony applies equally here and satisfies the James balancing
16  test. First, considering the evidence for the limited purposes of
    Section 352 substantially furthers the trial court's truth-seeking
17  function. Johnson sought to use the testimony of Claussen to
    convince the jury he did not rob Claussen and, by extension,
18  commit the other robberies, when in fact he was the person who
    robbed Claussen. The court's reliance on his suppressed confession
19  significantly furthered its truth-seeking function by ensuring the
    jury was not confused or misled by a bogus argument.
20
        Second, the court's use of the suppressed confession in this instance
21  raised no threat of police misconduct. A law enforcement officer
    has nothing to gain from this decision. It is entirely improbable a
22  law enforcement officer would omit or incompletely give a Miranda
    warning in the hope a resulting confession may be considered in a
23  Section 352 motion to counter a misleading argument by a
    duplicitous defendant. Such a scenario is too speculative and
24  tenuous for a law enforcement officer to entertain while conducting
    an interrogation.
25
        Moreover, the court's use of Johnson's confession under Section
26  352 was outside the sweep of the Miranda presumption and did not
    violate Johnson's Fifth Amendment rights, as the evidence was not
27  used by the prosecution in its case-in-chief. The confession was not
    used to determine Johnson's guilt of any of the crimes with which
28  he was charged. The jury never heard or knew of Johnson's

confession.  Indeed, the trial court considered only that portion of the confession where Johnson admitted committing an uncharged offense.  Johnson cannot argue the confession resulted in him incriminating himself when he was not charged with the crime to which he confessed.

Johnson argues the trial court's consideration of his confession violated the rule of Holmes v. South Carolina (2006) 547 U.S. 319, 126 S. Ct. 1727, 164 L.Ed.2d 503 but that case does not apply here. There, the Supreme Court struck down a state rule of evidence that third-party guilt was inadmissible where there was strong evidence, particularly, strong forensic evidence, of the defendant's guilt.  The high court invalidated the rule in part because it preempted the trial court from considering the prejudicial effects of the third-party evidence with its probative value, as well as the credibility of the prosecution's evidence, and thus was an arbitrary rule.  (Id. at pp. 326–331, 126 S. Ct. 1727.)  Of course, the process missing in the state rule was the very process in which the trial court here was engaged when it considered Johnson's confession – weighing the probative value of Johnson's third party evidence with its prejudicial effect and in consideration of the prosecution's suppressed evidence.  Holmes v. South Carolina did not involve the effect of Miranda on the court's consideration of a suppressed confession under Section 352, and thus it does not aid Johnson at all.

We are aware the Supreme Court in James, supra, 493 U.S. 307, 110 S. Ct. 648, 107 L.Ed.2d 676, determined the impeachment exception to the Fourth Amendment's exclusionary rule did not extend to the prosecution's use of evidence illegally obtained from a defendant to impeach the testimony of defense witnesses besides defendant.  In that case, the high court reasoned that allowing a defendant's inculpatory statement, suppressed as fruit of an unlawful arrest, to be used to impeach other defense witnesses would not significantly promote the court's truth-seeking function as it would likely chill defendants from presenting a defense through the testimony of others.  (Id. at pp. 314–316, 110 S. Ct. 648.)  The court also determined that admitting the suppressed statement to impeach all defense witnesses would encourage police misconduct to obtain evidence unlawfully, as such evidence could be used against potentially many more witnesses.  (Id. at pp. 317–319, 110 S. Ct. 648.)

Although we apply the balancing test announced in James, we reach a different conclusion on the facts presented to us.  The reasoning of James is inapposite here.  The trial court did not authorize use of Johnson's confession to impeach a witness.  Rather, the court considered the confession in order to prevent Johnson from extrapolating a false argument from truthful testimony.  James was concerned that a broad exception to the exclusionary rule would chill defendants from calling witnesses "who would otherwise offer probative evidence."  (James, supra, 493 U.S. at p. 316, 110 S. Ct. 648 italics added, fn. omitted.)  James said nothing about a defendant's attempt to use Miranda as a sword to force the jury to consider a false and misleading argument.

36

/////

As already stated, unlike in <u>James</u>, allowing the trial court to utilize the suppressed confession when ruling on the admissibility of evidence under Section 352 significantly promotes the court's truth-seeking function, as it prevents false or misleading argument from being made to the jury.  The only defense chilled by the trial court's action was a false defense.

Moreover, the trial court's consideration of the suppressed confession did not weaken the exclusionary rule's deterrent effect.  It did not increase the number of witnesses against which the confession could be used, nor did it significantly increase the occasions on which the confession could be used.

In effect, the trial court was using Johnson's suppressed confession to impeach Johnson's implied claim that he did not perform the Claussen robbery.  Such use was approved in <u>Harris</u> and recognized approvingly in <u>James</u>.  (<u>James</u>, <u>supra</u>, 493 U.S. at pp. 312–313, 110 S. Ct. 648.)  Because the focus here is solely on Johnson, the risks contemplated by the <u>James</u> court do not exist in this case.

The Supreme Court of Illinois faced a situation similar to this case in <u>People v. Payne</u> (1983) 98 Ill.2d 45, 74 Ill.Dec. 542, 456 N.E.2d 44 (<u>Payne</u>), and reached the same result we do.  There, after arresting the defendants, police officers searched their apartment without a warrant.  They found two handguns inside a refrigerator.  The trial court suppressed the weapons.  (<u>Id.</u> at pp. 48–49, 74 Ill.Dec. 542, 456 N.E.2d 44.)

On defendant's cross-examination of one of the arresting officers, however, counsel asked if the defendants and their apartment were searched.  The officer said they were, and counsel asked no further questions.   The trial court determined this cross-examination "'opened the door'" to admitting one of the suppressed weapons to rebut the false impression created by the cross-examination that nothing was recovered from the apartment.  (<u>Payne</u>, <u>supra</u>, 98 Ill.2d at pp. 49–50, 74 Ill.Dec. 542, 456 N.E.2d 44.)

The Illinois Supreme Court upheld the trial court's admission of the suppressed weapon.  Although <u>Payne</u> preceded <u>James</u>, the Illinois Supreme Court presciently applied the balancing test later established by <u>James</u>, and its reasoning applies equally here:  "The problem in this case arose not from false statements, made by defendants while testifying, but rather from cross-examination and potential argument by the defense which falsely implied the absence of physical evidence connecting defendants with the crimes . . . .  [W]e do not believe that [defendants] could affirmatively misrepresent or falsely imply that the police found no physical evidence connected with the robbery during their search.  [Citations.]

"'There is no gainsaying that arriving at the truth is a fundamental goal of our legal system'  (<u>United States v. Havens</u> (1980) 446 U.S. 620, 626, 100 S. Ct. 1912, 1916, 64 L.Ed.2d 559, 565), and we

1
2
3

> consider that allowing the defense or prosecution to misrepresent to the jury the actual facts of the case is neither consistent with the proper functioning and continued integrity of the judicial system nor with the polices of the exclusionary rules." (Payne, supra, 98 Ill.2d at pp. 50–52, 74 Ill.Dec. 542, 456 N.E.2d 44.)

4
5
6
7

> In this instance, the truth-seeking function of the court outweighs any threat of police misconduct or of a violation of Johnson's right not to incriminate himself. As a result, the trial court did not abuse its discretion under Section 352 when it refused to admit evidence of the Claussen robbery based on Johnson's suppressed confession to that robbery. The court's action did not violate Johnson's rights to a presumption of innocence, to present a defense, and to the protections of Miranda.

8  Id. at 278-85.

9      In his claim before this court, petitioner again asserts that the trial court violated the

10  presumption of innocence when it considered his suppressed confession in determining the

11  admissibility of Thomas Claussen's potential testimony. (ECF No. 32 at 29.) He argues, "there

12  is no authority for applying the presumption of innocence differently to confessing and

13  nonconfessing defendants." (Id.) Petitioner argues that the trial court's determination that

14  Claussen's testimony might have misled the jury was based on "the trial court's own belief in

15  petitioner's guilt." (Id. at 31.) He argues, as he did in state court, that the trial court's ruling

16  violated the holding in Holmes v. South Carolina, 547 U.S. 319 (2006), wherein the United States

17  Supreme Court held that the trial court's refusal to admit third-party culpability evidence based

18  on a state court rule which excluded such evidence if the prosecution evidence strongly supported

19  a guilty verdict denied the defendant a fair trial. (Id.) Petitioner argues that "focusing solely on

20  the confession, as the trial court did in Mr. Johnson's case, is the equivalent of focusing only on

21  the strength of evidence of guilt, as the South Carolina trial court did in Holmes." (Id.)

22      Petitioner further argues that he was prejudiced by the trial court's exclusion of Claussen's

23  potential testimony that the Arco/Valero robber had darker skin than petitioner, and that Claussen

24  had failed to identify petitioner as his assailant at a live lineup. Petitioner reasons that the

25  prosecution's case, which according to him was based largely on unreliable eyewitness

26  identifications, was relatively weak and thus Claussen's testimony was "important and dramatic

27  evidence for the defense." (Id. at 32.) He argues that the prejudice he suffered as a result of the

28  trial court's ruling was not mitigated by the fact that he was allowed to put on other evidence

1    suggesting that Thaddeus Taylor was the perpetrator of the robberies.  (Id.)  Petitioner also asserts

2    that the third-party culpability evidence he *was* allowed to introduce at trial was not as strong as

3    the potential Claussen testimony would have been.  (Id. at 33.)  He contends that the trial court's

4    ruling prevented him from putting on the "strongest case possible in his defense."  (Id.)  Petitioner

5    also argues that the Claussen's potential testimony "would cause a reasonable juror to question

6    the reliability of the generic descriptions given by the other witnesses."  (Id. at 34.)

7            Finally, petitioner argues that the trial court's evidentiary rulings, which according to

8    petitioner were based on the trial judge's personal belief that petitioner was guilty of the

9    Arco/Valero robbery, constituted structural error.  (Id.)  He argues, "the [trial] court's ultimate

10   analysis that Mr. Johnson's defense should be restricted from presenting third-party culpability

11   evidence because of the existence of an inadmissible confession is a form of implicit bias."  (Id.)

                        **2.  Applicable Legal Standards and Analysis**

13           Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in

14   the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

15   guarantees criminal defendants "a meaningful opportunity to present a complete defense" and the

16   right to present relevant evidence in their own defense.  Holmes, 547 U.S. at 324 (quoting Crane

17   v. Kentucky, 476 U.S. 683, 690 (1986)).  However, the United States Supreme Court has not

18   "squarely addressed" whether a state court's exercise of discretion to exclude testimony violates a

19   criminal defendant's right to present relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59

20   (9th Cir. 2009).  Nor has the Supreme Court clearly established a "controlling legal standard" for

21   evaluating discretionary decisions to exclude the type of evidence at issue here.  Id. at 758.

22   Accordingly, the decision of the California Court of Appeal that the trial court did not violate

23   petitioner's federal constitutional rights in excluding proffered evidence of third party culpability

24   is not contrary to or an unreasonable application of clearly established federal law and may not be

25   set aside.  Id.  See also Knowles v. Mirzayance, 556 U.S. 111, 112 (2009) ("it is not 'an

26   unreasonable application of' 'clearly established Federal law' for a state court to decline to apply

27   a specific legal rule that has not been squarely established by [the United States Supreme

28   Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is "unauthorized" under §

1    2254(d)(1) when the Supreme Court's decisions "give no clear answer to the question presented,

2    let alone one in [the petitioner's] favor," because the state court cannot be said to have

3    unreasonably applied clearly established federal law); <u>Brown v. Horell</u>, 644 F.3d 969, 983 (9th

4    Cir. 2011) ("Between the issuance of <u>Moses</u> and the present, the Supreme Court has not decided

5    any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to

6    present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such

7    exclusions.").

8         More specifically, as respondent points out, petitioner has failed to cite any federal case

9    holding that a trial court violates a defendant's federal constitutional rights, or misapplies the

10   presumption of innocence, by considering a defendant's inadmissible but reliable confession in

11   deciding whether to admit evidence of third party culpability under state evidentiary rules.  For

12   this reason alone, the state court decision rejecting petitioner's arguments on this issue was not

13   objectively unreasonable and petitioner is not entitled to federal habeas relief.

14        Petitioner's claim also fails on the merits.  Evidence of potential third-party culpability

15   must be admitted when, under the "facts and circumstances" of the individual case, its exclusion

16   would deprive the defendant of a fair trial.  Thus, in <u>Chambers v. Mississippi</u>, 410 U.S. 284, 303

17   (1973), exclusion of evidence of a third party confession was found to violate due process where

18   the excluded evidence was highly corroborated and the excluded testimony was crucial to the

19   defense.  Likewise, in <u>Lunbery v. Hornbeak</u>, 605 F.3d 754, 760-61 (9th Cir. 2010), the exclusion

20   of a statement by a third party that he had killed defendant's husband deprived defendant of the

21   right to present a defense because the "excluded testimony . . . bore substantial guarantees of

22   trustworthiness and was critical to [defendant's] defense."  On the other hand, where the

23   proffered evidence of third party culpability simply affords a possible ground of suspicion

24   pointing to a third party and does not directly connect that person with the actual commission of

25   the crime, that evidence may be properly excluded.  <u>People of Territory of Guam v. Ignacio</u>, 10

26   F.3d 608, 615 (9th Cir. 1993) (citing <u>Perry v. Rushen</u>, 713 F.2d 1447, 1449 (9th Cir. 1983)).

27        Even if Claussen's statements had been admitted into evidence at petitioner's trial for all

28   purposes, this would not have absolved petitioner of the charged crimes.  Mr. Claussen's

40

1   proposed testimony that he believed the perpetrator of the robbery committed at his gas station

2   was "darker" than petitioner, is vague and subjective and would not have been particularly

3   relevant to the question whether petitioner committed any robberies other than the Arco/Valero

4   robbery.  Nor was Claussen's potential testimony "crucial" to petitioner's defense because, as the

5   California Court of Appeal pointed out, petitioner was still allowed to present other evidence

6   tending to cast the blame for at least some of the robberies on Mr. Taylor.  Specifically, as noted

7   by the state appellate court:

8          The jury heard all of the testimony concerning the similarities
           between Johnson and Thaddeus.  They looked similar, they lived
9          together, they shared clothes, and they both were unemployed and
           needed money to pay rent.  Thaddeus knew Holmes.  He also knew
10         where Johnson kept his gun.  There was even evidence that one of
           the witnesses who came upon the murder scene, when shown two
11         photo lineups, excluded Johnson as the suspect but included
           Thaddeus as someone who resembled the suspect.  Defense counsel
12         also argued to the jury that Thaddeus was the perpetrator.

13  Johnson, 183 Cal.App.4th at 280.

14         Petitioner does not deny that the jury heard all of this evidence and argument.  Rather, he

15  merely argues that the proposed testimony by Claussen was stronger than the evidence of third-

16  party culpability he was allowed to present at trial.  The undersigned disagrees.  Given all of the

17  evidence that petitioner was able to present at trial which supported his defense that Thaddeus,

18  and not petitioner, may have been the perpetrator of the charged crimes, the proposed testimony

19  by Claussen about an uncharged and apparently unrelated robbery would have added little of

20  substance to petitioner's third-party culpability defense.  At most, Claussen's proposed testimony

21  afforded a "possible ground of suspicion" pointing to Thaddeus Taylor.  It certainly did not

22  directly connect Taylor with the actual commission of any of the robberies with which petitioner

23  was charged and convicted.

24         Even assuming arguendo that the trial court's exclusion of Claussen's proposed testimony

25  was constitutional error, any such error could not have had a "substantial and injurious effect or

26  influence in determining the jury's verdict" under the circumstances of petitioner's case.  Brecht

27  v. Abrahamson , 507 U.S. 619, 623 (1993) (in a federal habeas corpus proceeding, the federal

28  court must determine whether any error had a "substantial and injurious effect" on the jury's

1   verdict); Henry v. Ryan, 720 F.3d 1073, 1089 (9th Cir. 2013). See also Fry v. Pliler, 551 U.S.

2   112, 121-22 (2007) (Brecht harmless error review applies whether or not the state court

3   recognized the error and reviewed it for harmlessness). The significant evidence of petitioner's

4   involvement in the robberies and murder with which he was charged and convicted was

5   summarized by the California Court of Appeal and is set forth above. In light of that evidence,

6   the exclusion of the testimony from a gas station clerk in an uncharged robbery who believed the

7   robber of his station was "darker" than petitioner and that he was unable to pick petitioner as the

8   robber out of a lineup, does not lessen this court's confidence in the jury's verdict in this case.

9         Finally, petitioner argues that the trial judge's evidentiary ruling excluding Claussen's

10  potential testimony was improperly based on the judge's personal bias that petitioner was guilty

11  of the Arco/Valero gas station robbery. Assuming arguendo that this claim was exhausted in state

12  court and is properly before this court, it lacks merit and should be rejected. There is no evidence

13  before this court that the trial judge's ruling with regard to the potential Claussen testimony was

14  based on any personal bias against petitioner. The trial judge was simply considering the fact of

15  petitioner's prior confession to that robbery, in addition to other facts of record, to determine

16  whether introduction into evidence at petitioner's trial of Claussen's testimony would be

17  substantially more prejudicial than probative in this case.

18        As the Ninth Circuit has explained:

19              The Supreme Court has long established that the Due Process
                Clause guarantees a criminal defendant the right to a fair and
20              impartial judge. See In re Murchison, 349 U.S. 133, 136, 75 S. Ct.
                623, 99 L.Ed. 942 (1955). To succeed on a judicial bias claim,
21              however, the petitioner must "overcome a presumption of honesty
                and integrity in those serving as adjudicators." Withrow v. Larkin,
22              421 U.S. 35, 47, 95 S. Ct. 1456, 43 L.Ed.2d 712 (1975). In the
                absence of any evidence of some extrajudicial source of bias or
23              partiality, neither adverse rulings nor impatient remarks are
                generally sufficient to overcome the presumption of judicial
24              integrity, even if those remarks are "critical or disapproving of, or
                even hostile to, counsel, the parties, or their cases." Liteky v.
25              United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L.Ed.2d 474
                (1994); see United States v. Martin, 278 F.3d 988, 1005 (9th Cir.
26              2002).

27  Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008). Accordingly, in order to sustain a

28  claim of judicial bias on habeas corpus, the issue is "whether the state trial judge's behavior

1   rendered the trial so fundamentally unfair as to violate federal due process under the United States

2   Constitution."  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995).  Petitioner has failed to

3   make that demanding showing here.[3]

4          For all of these reasons, petitioner is not entitled to federal habeas relief with respect to his

5   federal constitutional challenge to the trial court's decision to exclude Claussen's potential

6   testimony at petitioner's trial.

7          **C.  Petitioner's Explanation for Admissions**

8          In petitioner's third ground for relief, he claims that the trial court violated his rights to a

9   fair trial, to cross-examine the witnesses against him, and to due process when it ruled that his

10  _____

11  [3]   In his traverse, petitioner argues, apparently for the first time, that he did not, in fact, confess to
     the Valero gas station robbery and that the opinion of the California Court of Appeal, which states
12  that he did, is based on an unreasonable determination of the facts of his case.  (ECF No. 45 at 16-
     19.)  Petitioner argues that the record demonstrates he was confused about which robbery was
13  being discussed and that he was most likely confessing to a different robbery when he made the
     statement in question.  (Id.)  First, of course, arguments and claims should not be raised for the
14  first time in a traverse.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a
     traverse is not the proper pleading to raise additional grounds for relief); Greenwood v. Fed.
15  Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued
     specifically and distinctly in a party's opening brief"); Tyler v. Mitchell, 416 F.3d 500, 504 (6th
16  Cir. 2005) ("Because the penalty-phase insufficiency argument was first presented in Tyler's
     traverse rather than in his habeas petition, it was not properly before the district court, and the
17  district court did not err in declining to address it.").  Presentation of new arguments and claims in
     a traverse unfairly precludes the respondent from properly addressing those arguments.  In any
18  event, petitioner has failed to demonstrate that the decision of the California Court of Appeal with
     respect to this claim was based on an unreasonable determination of the facts.  Under the
19  AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and
     convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a
20  state court and based on a factual determination will not be overturned on factual grounds unless
     objectively unreasonable in light of the evidence presented in the state-court proceeding, §
21  2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  See also Hibbler v. Benedetti, 693
     F.3d 1140, 1146-47 (9th Cir. 2012) (same); Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir.
22  2004) (same).  Here, petitioner has failed to demonstrate that the state courts' determination that
     he confessed to the Arco/Valero gas station robbery was objectively unreasonable and should be
23  overturned on habeas review under the applicable standard.  This is particularly so since
     petitioner not only admitted he robbed the gas station located on San Juan Avenue and Winding
24  Way (the location of the Arco/Valero), but also identified the surveillance photo of himself at that
     location and claimed to have obtained $50 "at the most" in the robbery.  (See Resp't's Lod. Doc.
25  21 (volume 1 of 2), at 78-79).  In light of this record, the state court's determination that
     petitioner confessed to the Arco/Valero robbery was not unreasonable, notwithstanding
26  petitioner's suggestion to the contrary in his traverse.

27

28

trial counsel could not elicit from his girlfriend Natalie Brand an exculpatory statement he made
to her about the murder.  (ECF No. 32 at 35.)  Petitioner argues that this exculpatory statement
should have been admitted into evidence at his trial in order to explain incriminating statements
about the murder that he had previously made to Brand which were admitted.  (Id. at 36.)  He
contends that "the trial court allowed the prosecution to admit only the portions of statements by
Mr. Johnson that were favorable to the prosecution's position and exclude the portions that
explained the statements as false confessions."  (Id. at 37.)  Petitioner also argues that the trial
court violated state law in excluding at trial evidence of his exculpatory statement to Brand.  (Id.
at 36-37.)

### 1. State Court Decision

The California Court of Appeal explained the background to this claim and the reasoning
underlying its decision thereon, as follows:

> Johnson faults the trial court for not admitting into evidence
> pursuant to Evidence Code section 356 an exculpatory statement he
> allegedly made to one of his girlfriends, Natalie Brand.   He
> particularly faults the court because it admitted into evidence
> inculpatory statements he made to Natalie but would not admit his
> exculpatory statement.  We conclude the inculpatory statement was
> not admissible under Evidence Code section 356 (Section 356), and
> thus the trial court did not err.
>
> **A. Background information**
>
> When Natalie was interviewed by detectives for the first time, she
> told them Johnson had told her the day after the murder, and before
> being arrested, that he went to rob the clerk but he did not mean to
> shoot and kill him.  Natalie made similar statements to detectives in
> a second interview.  Natalie also told the detectives during the
> second interview that Johnson admitted to her that he had killed the
> clerk.  He had gone to do the robbery because his uncle had kicked
> him out of the house.
>
> During motions in limine, defense counsel sought to introduce
> pursuant to Section 356 a statement of Johnson's that Natalie
> relayed to detectives when she was interviewed a third time, some
> two months after her second interview.  Allegedly at some point
> after being arrested, Johnson had told Natalie that he did not do it
> and that "'he was just protecting somebody.'"
>
> The trial court denied the motion.  It ruled Johnson's statement was
> not admissible under Section 356 because the statement "does not
> come within 356 as filling out the context of it, but it still stands
> alone as a self-serving out-of-court statement[.]"

44

1    /////

2         Prior to Natalie testifying, defense counsel reasserted that Johnson's
     exculpatory statement to Natalie should be admitted pursuant to
3    Section 356.   He claimed the interest of justice required the
     statement to be admitted so the jury was not left with the
4    impression that Johnson never denied committing the murder.  He
     also claimed it was unfair not to admit the statement under Section
5    356 because Natalie would then be limited to discussing only
     Johnson's inculpatory statements but not the exculpatory statement.
6

7         The prosecutor argued the exculpatory statement should be
     excluded because it was hearsay with no exception.   He also
8    claimed the statement was not admissible under Section 356
     because the statement, made after Johnson's arrest, had no
9    connection to explain or complete his earlier statements made to
     Natalie prior to his arrest.

10        The trial court again denied Johnson's request to introduce his
     exculpatory statement due to the lack of a hearsay exception
11   admitting the evidence.  It also denied the request on the basis that
     even if the statement was not hearsay, it would not be admissible
12   under Evidence Code Section 356 because the exculpatory
     statement was not made in the same conversation as the inculpatory
13   statements and because Evidence Code Section 356 did not admit
     hearsay evidence.
14

15        The court stated:   "On the evidentiary issue, I am not going to
     permit the elicitation from Natalie Brand of self-serving hearsay
16   statements from the defendant to her.  There are proper ways to get
     that evidence before the jury if that is the defendant's desire.  It
17   simply is a situation where the defendant can in every case –
     speaking now in the generic sense – say to his girlfriend or mother
18   or anybody else who would serve his purposes that he didn't do the
     thing and therefore . . . boot strap his self-serving statement into
19   evidence.

20        "There is a reason why hearsay evidence is excluded absent some
     specific exception and, you know, those reasons that several are
21   valid and need to be respected.

22        "I do think that there is some substance to the defendant's [Section]
     356 argument.  If it were in the context of a specific immediate
23   conversation in which the defendant both inculpates and exculpates
     himself that your [Section] 356 argument that the exculpating
24   statement ought to be admitted has more merit, has more traction.  I
     still feel it's precluded under the hearsay rules, but I think it's a
25   different situation than a situation where there is a separate, discrete
     communication from Natalie Brand to the defendant or from
26   Natalie Brand to the detectives where she simply references the
     defendant's self-serving hearsay.  That's not required.  [Section]
27   356 simply does not stand for the proposition that the self-serving
     hearsay comes in."

28   /////

                                        45

/////

## B. Analysis

Section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

"The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' [Citations.]" (People v. Arias (1996) 13 Cal.4th 92, 156, 51 Cal. Rptr.2d 770, 913 P.2d 980.)

A court does not abuse its discretion when under Section 356 it refuses to admit statements from a conversation or interrogation to explain statements made in a previous distinct and separate conversation. (See People v. Williams (2006) 40 Cal.4th 287, 319, 52 Cal. Rptr.3d 268, 148 P.3d 47 [within court's discretion not to admit statements made by defendant in first interview with detectives to explain statements made in another interview 24 hours later]; People v. Barrick (1982) 33 Cal.3d 115, 131–132, 187 Cal. Rptr. 716, 654 P.2d 1243 [within court's discretion not to admit postarrest statements to explain prearrest statements; defendant's arrest and admonishment of constitutional rights separated the interrogation into two separate interrogations].)

The trial court did not abuse its discretion here in refusing to admit Johnson's exculpatory statement under Section 356. The court reasonably determined that Johnson's admissions and his exculpatory statements to Natalie were made at different times. Natalie first told detectives about Johnson's inculpatory statements shortly after his arrest, and she stated he made them prior to his arrest. About two months later, Natalie told detectives of Johnson's exculpatory statement. There is no evidence defendant's inculpatory and exculpatory statements were part of the same conversation. Thus, the later, postarrest exculpatory statement did not qualify for admission under Section 356.

The statement also did not qualify for admission under Section 356 because Johnson's exculpatory statement was not necessary to make his prior admissions understood. His earlier admissions to Natalie and others were unambiguous.

Johnson claims not admitting the exculpatory statement under Section 356 because it did not satisfy a hearsay exception was an invalid ground for rejecting the evidence. Assuming for purposes

of argument it was, we nonetheless uphold the decision on the correct basis just discussed. "'"'It is judicial action and not judicial reasoning which is the subject of review[.]'"'" (People v. Parrish (2007) 152 Cal.App.4th 263, 271, fn. 4, 60 Cal.Rptr.3d 868, (Parrish).)

Johnson also claims the court's action created an inaccurate picture of Johnson's statements by including only the inculpatory statements and excluding the exculpatory statement. (See Parrish, supra, 152 Cal.App.4th at pp. 272–273, 60 Cal. Rptr.3d 868.) But the Parrish court made it clear, in allowing both exculpatory and inculpatory statements by a codefendant in that case to be admitted, that its ruling under Section 356 arose because the admitted statements were made in the same interview. (Id. at pp. 269, 270, 276, 60 Cal.Rptr.3d 868.) There is no evidence here that Johnson made his exculpatory statement to Natalie during the same conversation they had prior to his arrest.

The trial court thus did not abuse its discretion in denying Johnson's request under Section 356.

Johnson, 183 Cal.App.4th at 285-88.

### 2. Petitioner's Arguments in the Traverse

In his traverse, petitioner argues for the first time that the California Court of Appeal's decision rejecting his arguments on this issue was based on an unreasonable determination of the facts. Specifically, he points to the state appellate court's statement that his exculpatory comment to Brand

did not qualify for admission under Section 356 because [Petitioner's] exculpatory statement was not necessary to make his prior admissions understood. His earlier admissions to Natalie and others were unambiguous.

(ECF No. 45 at 22.) Petitioner argues that, contrary to the California Court of Appeals' characterization of his statements, the "admissions" he made during police interrogations were "ambiguous" and "included indications that he was willing to accept responsibility for crimes he did not commit," in order to protect his cousin Thaddeus Taylor from being prosecuted for the robberies. (Id.)

In support of this argument, petitioner cites a portion of the transcript of his police interview wherein he told a police detective that he didn't want to get Thaddeus "in trouble." A review of the state court record reflects that after petitioner admitted to committing at least five

specific robberies in the Sacramento area, he made the following statements to police:

> DET. CABRAL:  Let's uh – are there any other – before we go any further, there – are there any other robberies?  You're saying about five.  Have you done any other ones out of town?

> PETITIONER:  No.

> DET. CABRAL:  Okay.

> PETITIONER:  Not that I can remember.

> DET. CABRAL:  Okay.

> DET. KOLB:  Um –

> DET. CABRAL:  You're – you're, uh, Beretta – you don't want to get Thaddeus in trouble; do ya?

> PETITIONER:  What do you mean by that?

> DET. CABRAL:  Well, the gun.

> PETITIONER:  Why is Thaddeus getting in trouble?

> DET. CABRAL:  It's in his room.

> PETITIONER:  Is that where?

> DET. CABRAL:  Um-hum.

> PETITIONER:  (Inaudible).

> DET. CABRAL:  In the speaker.  Is that where it's at?

> PETITIONER:  If you want to go get it, I guess.

> DET. CABRAL:  No.  I – I mean you seem like you're being up front, and I don't want to play games.  Is that where you left it?

> PETITIONER:  No.

> DET. CABRAL:  Who put it there?  Who put the gun in the speaker?

> PETITIONER:  I don't know.

> DET. CABRAL:  Was it you or Thaddeus?  (Inaudible) –

> PETITIONER:  (Unintelligible)  it's me because I don't want to get him in trouble.

> DET. CABRAL:  No.  If it was – if it – you know, if it was him, it was you or Uncle Fred, you're the only three that live in that house.

1    PETITIONER:  No, no.  It was me.

2    DET. CABRAL:  What'd you put it in?  Describe what you put it in
     then.

3    J. JOHNSON:  A blue beanie.

4    DET. CABRAL:  What else?

5    PETITIONER:  Bullets.

6    DET. CABRAL:  What else?

7    PETITIONER:  Hollow tips.

8    DET. CABRAL:  What else?

9    PETITIONER:  That's it.

10   DET. CABRAL:  I'm talking about something out –

11   PETITIONER:  I wrapped it up.

12   DET. CABRAL:  Did you wipe it down?

13   PETITIONER:  No.  I just wrapped it up.

14

15   (Resp't's Lod. Doc. 21 (volume 1) at 46-47.)

16          Petitioner states that the police interview during which he made the statements related

17   above occurred shortly before he told Natalie that he had committed the murder.  He argues that

18   the close proximity in time between his police interview and his incriminating statement to

19   Natalie indicates that he was still trying to protect his cousin Thaddeus when he made this false

20   statement.  (ECF No. 45 at 23.)  Petitioner also appears to be arguing that the statements he made

21   to police, set forth above, render his incriminating statements to his girlfriend Natalie Brand

22   "ambiguous" because he was at that time still trying to protect Thaddeus Taylor.  Petitioner

23   contends that his statements to Brand, considered in light of his statements he made to the police,

24   were not "reliable and unambiguous."  (Id. at 23.)  Therefore, according to petitioner, the trial

25   court should have allowed his later statement to Brand, that he did not commit the murder and

26   was just protecting somebody when he said he did, to be admitted into evidence under California

27   Evidence Code § 356 in order to clarify that he initially lied to Brand in order to protect his

28   cousin, Thaddeus Taylor.    Petitioner also argues that his later statement to Brand that he was

                                                    49

1   /////

2   "just protecting somebody" is consistent with his earlier statement to police that he didn't want to

3   get Thaddeus in trouble.  (Id. at 22.)

4   **3.  Applicable Law**

5   As explained above, criminal defendants have a constitutional right, implicit in the Sixth

6   Amendment, to present a defense; this right is "a fundamental element of due process of law."

7   Washington v. Texas, 388 U.S. 14, 19 (1967).  However, the constitutional right to present a

8   defense is not absolute.  Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003).  "[A] defendant

9   does not have an absolute right to present evidence, no matter how minimal its significance or

10  doubtful its source."  Jackson v. Nevada, 688 F.3d 1091, 1096 (9th Cir. 2012), reversed on other

11  grounds by Nevada v. Jackson, ___ U.S. ___, 133 S. Ct. 1990 (2013).  "Even relevant and reliable

12  evidence can be excluded when the state interest is strong."  Alcala v. Woodford, 334 F.3d 862,

13  877 (9th Cir. 2003) (quoting Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).

14  A state law justification for exclusion of evidence does not abridge a criminal defendant's

15  right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a

16  weighty interest of the accused."  United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also

17  Crane, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to

18  exclude evidence at trial and the federal constitutional right to "present a complete defense");

19  Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002); Perry, 713 F.2d at 1451 (While "[t]he

20  right to present a defense is fundamental," "the state's legitimate interest in reliable and efficient

21  trials is also compelling.").  Further, a criminal defendant "does not have an unfettered right to

22  offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of

23  evidence."  Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S.

24  400, 410 (1988)).  "A habeas petitioner bears a heavy burden in showing a due process violation

25  based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

26  The United States Supreme Court has acknowledged a "traditional reluctance to impose

27  constitutional restraints on ordinary evidentiary rulings by state trial courts."  Crane, 476 U.S. at

28  689.  The Supreme Court has further made clear that federal habeas power does not allow the

50

1   granting of relief on the basis of a belief that the state trial court incorrectly interpreted the state

2   evidence code in ruling on the admissibility of evidence.  Estelle, 502 U.S. at 72; see also Briceno

3   v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009).  A petitioner seeking habeas relief from an

4   allegedly erroneous evidentiary ruling bears the burden of establishing that the evidentiary error

5   deprived the petitioner of due process because it was so pervasive that it denied the petitioner a

6   fundamentally fair trial.  Brecht, 507 U.S. at 637; see also Duncan v. Ornoski, 528 F.3d 1222,

7   1244 n. 10 (9th Cir. 2008); Larson, 515 F.3d at 1065.

8        Petitioner's claim, if any, that the trial court erred in its application of the California

9   Evidence Code in denying his request to admit his exculpatory remark to Natalie Brand is not

10   cognizable in this federal habeas corpus proceeding.  Thus, the question whether petitioner's

11   admissions to his girlfriend Natalie Brand were ambiguous, therefore requiring that they be

12   explained by his later statements to Brand pursuant to California Evidence Code § 356, is not

13   properly before this court.  Petitioner has failed to demonstrate that the state courts' application of

14   Evidence Code § 356 was erroneous, arbitrary, or capricious, or that it rendered his trial

15   fundamentally unfair in violation of the Due Process Clause.  Lewis v. Jeffers, 497 U.S. 764, 780

16   (1990).

17        In any event, petitioner's argument advanced in his traverse that his statements somehow

18   rendered ambiguous his incriminating admissions to police detectives and/or to Brand is

19   unavailing.  The record reflects that during petitioner's interrogation it was a police officer, not

20   petitioner, who suggested that petitioner didn't want to get Thaddeus Taylor "in trouble."  (CT at

21   46.)  Petitioner responded to the officer's suggestion by stating, "What do you mean by that?"

22   (Id.)  Although petitioner later responded that he hid the Beretta pistol in Thaddeus' room

23   because "I don't want to get him in trouble," he then immediately clarified that he had, indeed,

24   hidden the gun there himself.  (Id.)  This colloquy between petitioner and the police falls far short

25   of rendering petitioner's later admission to Brand that he killed the store clerk "ambiguous" or

26   untrustworthy.

27        Nor is petitioner entitled to habeas relief on a federal due process claim in connection with

28   this argument.  As explained above, the Ninth Circuit Court of Appeals for has observed that the

Case 2:12-cv-02887-MCE-DAD   Document 46   Filed 04/08/15   Page 52 of 54

United States Supreme Court has not "squarely addressed" whether a state court's exercise of its discretion to exclude testimony violates a criminal defendant's right to present relevant evidence. Moses, 555 F.3d at 758-59; Brown, 644 F.3d at 983. Accordingly, the decision of the California Court of Appeal that the trial court's discretionary evidentiary ruling did not violate the federal constitution cannot be contrary to or an unreasonable application of clearly established United States Supreme Court precedent and may not be set aside. Id. See also Knowles, 556 U.S. at 112; Wright, 552 U.S. at 126.

Finally, given the significant evidence that petitioner committed the Chetty murder, the exclusion from evidence at his trial of petitioner's later, self-serving statement to Natalie Brand that he did not commit the murder but was merely "protecting somebody" when he previously told her he had indeed committed the murder, could not have had a "substantial and injurious effect or influence in determining the jury's verdict" under the circumstances of this case. Brecht, 507 U.S. at 623.

For all of these reasons, petitioner is not entitled to federal habeas relief with respect to this due process claim.

### D. Cumulative Effect of Errors by Trial Court

In his final claim for relief, petitioner argues that the cumulative effect of the trial court's erroneous rulings violated his "federal constitutional rights under the Fifth, Sixth and 14th Amendments." (ECF No. 45 at 24.) Petitioner argues that the trial court's rulings constituted "arbitrary" and "disproportionate" applications of state rules of evidence. (ECF No. 32 at 39.) The state appellate court rejected that contention on direct appeal, stating:

> Johnson claims the court's errors discussed above in parts II and III were cumulative constitutional errors. Because we have concluded they were not error, they a fortiori do not constitute cumulative error.

Johnson, 183 Cal.App.4th at 288.

The cumulative error doctrine in habeas recognizes that, "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002)

52

1   (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996)).  See also Cunningham v.

2   Wong, 704 F.3d 1143, 1165 (9th Cir. 2013).  However, where there is no single constitutional

3   error existing, nothing can accumulate to the level of a constitutional violation.  See Fairbank v.

4   Ayers, 650 F.3d 1243, 1257 (9th Cir. 2011) ("[B]ecause we hold that none of Fairbank's claims

5   rise to the level of constitutional error, 'there is nothing to accumulate to a level of a

6   constitutional violation.'") (citation omitted); Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011)

7   ("Because we conclude that no error of constitutional magnitude occurred, no cumulative

8   prejudice is possible.").  "The fundamental question in determining whether the combined effect

9   of trial errors violated a defendant's due process rights is whether the errors rendered the criminal

10  defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and

11  injurious effect or influence' on the jury's verdict."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir.

12  2007) (quoting Brecht, 507 U.S. at 637).

13      This court has addressed each of petitioner's claims of error above and has concluded that

14  no error of constitutional magnitude occurred in connection with his trial.  There is also no

15  evidence before this court that an accumulation of errors rendered petitioner's trial fundamentally

16  unfair.  Accordingly, petitioner is not entitled to federal habeas relief on his claim that cumulative

17  error resulted in a violation of his right to due process.

18  **IV.  Conclusion**

19      For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

20  application for a writ of habeas corpus be denied.

21      These findings and recommendations are submitted to the United States District Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26  shall be served and filed within fourteen days after service of the objections.  Failure to file

27  objections within the specified time may waive the right to appeal the District Court's order.

28  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

1    1991).  In his objections petitioner may address whether a certificate of appealability should issue

2    in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing

3    Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

4    enters a final order adverse to the applicant).

5    Dated:  April 7, 2015

6

7    _DALE A. DROZD_

8    UNITED STATES MAGISTRATE JUDGE

9    DAD:8:
     Johnson2887.hc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28